DALLAS GAS CO. v. STATE. (No. 6723.)*

(Court of Civil Appeals of Texas. Austin. March 12, 1924. Rehearing Denied April 2, 1924.)

1. Taxation ⟊42(1)—Classification for tax purposes must be reasonable.

Classification for tax purposes must be reasonable, and all those falling within the classification must be subject to payment of tax.

2. Taxation ⟊42(1)—Whether classification arbitrary or unreasonable determined by conditions under which occupation is pursued.

Whether classification is arbitrary or unreasonable must be determined by circumstances and conditions under which particular occupation is pursued.

3. Constitutional law ⟊205(1)—Taxation ⟊37—Statute imposing gross earnings tax held not violative of constitutional provision providing for equal rights.

Rev. St. art. 7371, imposing occupation tax on gas, electric, and water companies at one rate in cities of over 25,000 inhabitants, and at lesser rate in cities from 10,000 to 25,000, but imposing no tax on such corporations in places other than the two classes of cities, held not violative of Const. art. 1, § 3, providing for equal rights; the classification being reasonable and not arbitrary.

4. Taxation ⟊43—Statute imposing gross earnings tax on gas, electric, and water companies in certain cities held not violative of constitutional provision requiring uniformity.

Rev. St. art. 7371, imposing occupation tax on gas, electric, and water companies at one rate in cities of over 25,000 inhabitants, and at lesser rate in cities from 10,000 to 25,000, but imposing no tax on such corporations in places other than the two classes of cities, held not violative of Const. art. 8, §§ 1, 2, requiring uniformity in taxation; the classification being reasonable and not arbitrary.

5. Constitutional law ⟊229(1)—Statute imposing gross earnings tax held not violative of equal protection clause.

Rev. St. art. 7371, imposing occupation tax on gas, electric, and water companies at one rate in cities of over 25,000 inhabitants, and at lesser rate in cities from 10,000 to 25,000 inhabitants, but imposing no tax on such corporations in places other than the two classes of cities, held not violative of Const. U. S. Amend. 14; the classification not being arbitrary, discriminatory, or unreasonable.

6. Taxation ⟊157—Natural and artificial "gas" plants subject to gross earnings tax.

Rev. St. art. 7371, imposing occupation tax on "any gas plant," held applicable to natural gas plants as well as to artificial gas plants (citing Words & Phrases, First and Second Series, Gas).

7. Commerce ⟊69—Occupation tax on gas company held not violative of interstate commerce clause.

Occupation tax imposed on gas company under Rev. St. art. 7371, held not in violation of interstate commerce clause of the United States Constitution (article 1, § 8, cl. 3), though gas was delivered to local company within the state in pipe lines of another company engaged in interstate commerce.

8. Taxation ⟊47(4)—Levy of gross earnings tax on gas company held not double taxation.

Levy of occupation tax on local gas company under Rev. St. art. 7371, based on total gross receipts, held not double taxation, though such company received its gas from another company under contract to pay to latter an amount equal to two-thirds of its gross receipts, in absence of showing that latter paid any occupation tax and in view of nontaxable interstate character of its business.

**9. Taxation ⚖═595—Interest properly allowed on judgment rendered for state for unpaid gross earnings tax.**

Under Rev. St. art. 4981, providing that "all judgments" shall bear interest except in specified cases, in state's action to recover occupation tax due under article 7371, allowance of interest on amount of judgment from date was proper.

**10. Contracts ⚖═147(3)—Construed as whole.**

Contracts must be construed as whole to ascertain the intention of the parties.

**11. Contracts ⚖═152—Words are to be taken in generally accepted meaning.**

Words used are to be taken in their generally accepted meaning.

**12. Taxation ⚖═85—Gas company held engaged in sale of gas as owner and not as bailee or factor.**

Contract between gas company operating pipe line and local company supplying city consumers, designating parties as vendor and vendee, giving vendor no interest in local company nor authority to do business with its customers, and providing for sale, measurement, and delivery of gas, at junction point, was not a contract of bailment or factorage, but vested ownership of gas in local company subjecting it to occupation tax based on gross receipts, though contract provided for payment of "a price equal to two-thirds of the gross receipts from the sale of such gas to such customers."

**13. Taxation ⚖═840—State held entitled to penalty on recovery of gross earnings tax.**

Under Rev. St. 1911, arts. 7387, 7388, the state, upon recovery of occupation tax imposed by article 7371, on taxpayer's refusal to pay tax within the 30 days prescribed by the statute, was entitled to have judgment include a 10 per cent. penalty.

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Suit by the State of Texas against the Dallas Gas Company. Judgment for plaintiff, and defendant appeals. Reformed and affirmed.

Smith, Robertson & Robertson, of Dallas, and Slay, Simon & Smith, of Fort Worth, for appellant.

W. A. Keeling, Atty. Gen., and Bruce W. Bryant and Frank M. Kemp, Asst. Attys. Gen., for the State.

BAUGH, J. Article 7371 of the Revised Statutes of Texas provides as follows:

"*Gas, Electric Lights, Power or Waterworks.* —Each and every individual, company, corporation or association, owning, operating or managing or controlling any gas, electric light, electric power or waterworks or water and light plant, within this state and charging for gas, electric lights, electric power or water, shall make quarterly, on the first days of January, April, July and October of each year, a report to the comptroller of public accounts under oath of the individual or of the presi- dent, treasurer or superintendent of such company, corporation, or association, showing the gross amount received from the business done within this state in the payment of charges for gas, electric lights, electric power and water for the quarter next preceding. Said individual, company, corporation or association, at the time of making said report for any town or city of ten thousand inhabitants and less than twenty-five thousand inhabitants, shall pay to the treasurer of the State of Texas an occupation tax for the quarter beginning on said date equal to one-fourth of one per. cent. of said gross receipts, as shown by said report; and, for any town or city of twenty-five thousand inhabitants or more, the said individual, company, corporation or association, at the time of making said report, shall pay to the treasurer of the state of Texas an occupation tax for the quarter beginning on said date an amount equal to one-half of one per cent. of said gross receipts as shown by said report; provided, that nothing herein shall apply to any gas, electric light, electric power or waterworks or water and light plant within this state owned by any city or town. (Id. sec. 3.)"

This suit was filed by the state of Texas, through its Attorney General, against the Dallas Gas Company, to recover from it a total amount of $42,428.45, claimed by the state as taxes due by said company under said article 7371 for the years 1911 to June, 1922, according to the reports made by it under oath to the comptroller of public accounts. The state also asked for 10 per cent. penalty on the taxes due, provided in article 7378, Revised Statutes, and for interest at the rate of 6 per cent. per annum.

The gas company attacked said article of the statute as being in violation of the Fourteenth Amendment of the Constitution of the United States; and also in violation of section 35, art. 3, section 3 of article 1, and sections 1 and 2 of article 8 of the Constitution of Texas. The constitutionality of the article is brought before us on exceptions properly and seasonably raised in the court below. The gas company specially excepted to plaintiff's petition, on the ground that it did not show whether defendant was selling natural or artificial gas, and that the statute, even if valid, did not apply to the sale of natural gas, but only to those operating an artificial gas plant.

For further statement, we copy the following from appellant's brief:

"The answer of the Dallas Gas Company further set out that the act in question, even if valid, was not intended to impose double taxation upon the same identical gross receipts, and that in point of fact the Lone Star Gas Company was entitled to a certain proportion of the receipts, and that under said law, if valid and applicable, the Lone Star Gas Company was required to make the reports provided for in said law and to pay the tax due thereon, and that being so obligated, the Dallas Gas Company was not required to pay any gross receipts tax upon the same identical re--

⚖═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ceipts. The contract between the two companies was set out in said answer and referred to and also attached as an exhibit to such answer. The answer further set out that inasmuch as the Lone Star Gas Company was liable for the reports and tax on that part of the receipts belonging to it, that therefore the Dallas Gas Company was not liable for any tax upon said portion of receipts belonging to the Lone Star Gas Company, and that during all of the years in question the Dallas Gas Company had paid to the state the one-half of 1 per cent. due upon its portion of the receipts, and that accordingly the Dallas Gas Company was not liable in this suit for any amount.

"The Dallas Gas Company further in its answer set up that under the contract between it and the Lone Star Gas Company, the Dallas Gas Company was only entitled to the designated portion of the receipts received by it for charges for gas, and that the part remitted to the Lone Star Gas Company constituted no part of the receipts of the Dallas Gas Company, and that accordingly the Dallas Gas Company, having paid the tax upon its portion of the receipts, was not liable for any further sum. The Dallas Gas Company further set up in its answer that no penalty should be imposed, and that it had made its reports in good faith and paid the tax upon its receipts, and that each report made by it had shown that it was not paying any tax upon the receipts collected and remitted to the Lone Star Gas Company, and that accordingly no penalty should be imposed. The Dallas Gas Company further sets up in its answer that it was operating in the city of Dallas, under what was known as a 'Service at Cost Franchise,' and that under such franchise and under the operations of the Dallas Gas Company, the imposition of the tax constituted an unlawful and unreasonable discrimination against its more than 30,000 customers in the city of Dallas, since under the Constitution and laws, and under such franchise, the Dallas Gas Company would be required to collect from its customers sufficient amount to pay the tax in question, since under the franchise the Dallas Gas Company was permitted to earn only 8 per cent. upon its property, and that automatically under the franchise the rates and charges to its customers would be reduced, and that in order to determine the 8 per cent. taxes paid would be deducted. The Dallas Gas Company further set out that during all of the years involved there were other companies doing identically the same business in cities of less than 10,000 inhabitants and in other places in the state of Texas, and that such other companies received payments for charges for gas, and that the receipts of some other companies were largely in excess of the gross receipts of the Dallas Gas Company, and that any nonliability of said Lone Star Gas Company and other companies under said law constitutes a direct and gross, unreasonable and arbitrary discrimination against the Dallas Gas Company and its customers, and that said law is violative of the provisions of the Constitution of the United States and the state of Texas referred to and void.

"The state of Texas filed supplemental petition, in which it set up exceptions to the various allegations of the answer of the Dallas Gas Company.

"On February 23, 1923, the court below entered judgment overruling the general demurrer and special demurrer and special exceptions of the Dallas Gas Company, numbered I, II, III, IV, V, VI and VII, but sustained its exception No. VIII as to that part of plaintiff's petition seeking interest on said taxes, and the court further overruled the general demurrer as contained in paragraph 1 of the first supplemental petition of the state of Texas, but sustained the special demurrers and exceptions contained in paragraphs II, III, IV, V, VI, VIa and VII, contained in the first supplemental petition of the state of Texas, and the court then entered judgment for the state of Texas for the sum of $42,428.45, together with interest on said amount from the date of said judgment at the rate of 6 per centum per annum, together with all costs of court, to which judgment the defendant, the Dallas Gas Company, then and there in open court duly excepted and gave notice of appeal to the Court of Civil Appeals in and for the Third Supreme Judicial District of the State of Texas."

There also appears in the record the following stipulation, agreed to by the parties to the suit, viz.

"That defendant, the Dallas Gas Company, is a duly incorporated private corporation, incorporated under the laws of the state of Texas for the purpose of manufacturing and supplying of gas, the supply of light, heat and electric motor power, or either of them, to the public by any means; that defendant owned and operated, managed and controlled a gas plant in the city of Dallas, supplying natural gas to the consumers of the city of Dallas during all of the years mentioned in plaintiff's petition, but that at no time during all of said years has defendant manufactured or supplied artificial or manufactured gas to its consumers; that during all said years it supplied no consumer outside the city of Dallas; that the city of Dallas is, and during all of said years has been, a city of more than 25,000 inhabitants; that the character of gas supplied by defendant to consumers during said years was and is natural gas; that defendant during all said years charged consumers for said gas and that defendant has been so operating, owning and controlling a gas plant and supplying natural gas to consumers in the city of Dallas since the 1st day of January, 1911, and charging said consumers therefor; that the gross receipts collected from said charges of defendant to its consumers for said natural gas during the time and years for which plaintiff sued for said taxes herein amounted to the total sum of $12,-495,352, and the tax computed on said $12,-495,352 at one-half of 1 per cent. is the sum of $62,476.76, and that said defendant has heretofore paid to the state of Texas $20,048.31, leaving a balance of $42,428.45.

"That during all of said years the defendant has, in good faith and in the time provided by law, made reports, and remitted the amount of taxes, as shown by said reports and believed by defendant to be the whole amount of said taxes then due."

### Opinion.

The case is brought before us under seventeen assignments of error, upon which ap-

pellant bases seven propositions of law. Assignments Nos. 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, and 17 raise the question of the constitutionality of the statute. Appellant insists that because the act in question levies an occupation tax at one rate on those pursuing an occupation in cities of over 25,000 inhabitants, an occupation tax at a lesser rate upon those pursuing the same occupation in cities of 10,000 inhabitants and less than 25,000 inhabitants, and no occupation tax at all on those pursuing that same occupation in places other than these two classes of cities, it is void, and in violation of section 3 of article 1 and sections 1 and 2 of article 8 of the Constitution of Texas and of the Fourteenth Amendment to the Constitution of the United States. These sections of the state Constitution read as follows:

"Sec. 3. All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."

The portions of sections 1 and 2 of article 8 applicable to the question raised in this case read as follows:

"Section 1. Taxation shall be equal and uniform.

"Sec. 2. All occupation taxes shall be equal and uniform upon the same class of subjects within the limits of the authority levying the tax."

That portion of the Fourteenth Amendment to the Constitution of the United States applicable to this case reads as follows:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It is not disputed that said article of the statute is clearly a tax measure passed for the purpose of raising revenue, and not a regulation asserted under the police power of the state. Both the appellant and the appellee have briefed fully and carefully the questions raised, and the issues are clearly presented. The questions of equality and uniformity of various kinds of taxation have been before the appellate courts of the United States and of the various states times almost without number. Other sections of the law of which article 7371 is a part (see Acts of the Regular and First Called Session of Thirty-Seventh Legislature 1907, chap. 18, p. 479), have been attacked both in the state courts and in the United States courts. See G., H. & S. A. Ry. Co. v. Texas, 210 U. S. 217, 28 Sup. Ct. 638, 52 L. Ed. 1031; Houston Belt & Terminal Co. v. State, 108 Tex. 314, 192 S. W. 1054; Texas v. Humble Pipe Line Co., 112 Tex. 375, 247 S. W. 1082.

The first decision on the question of occu-

pation taxes we find in this state was rendered by the Supreme Court of Texas, in 1846 (see Aulanier v. Governor, 1 Tex. 653), in which the constitutionality of a liquor license was assailed. That was under the Constitution of 1845. In that Constitution (article 7, § 27) the following provision on the subject of taxation occurs:

"Taxation shall be equal and uniform throughout the state. All property in this state shall be taxed in proportion to its value, to be ascertained as directed by law; except such property as two-thirds of both houses of the Legislature may think proper to exempt from taxation. The Legislature shall have power to lay an income tax, and to tax all persons pursuing any occupation, trade, or profession; provided that the term 'occupation' shall not be construed to apply to pursuits either agricultural or mechanical."

This provision of the Constitution was carried forward in hæc verba in the Constitutions of 1861, 1866, and 1869. It will be noticed that this language does not expressly authorize the Legislature to classify occupations for purposes of taxation. In 1871 the Legislature levied and provided for collection of an occupation tax in various amounts on numerous occupations, including the following:

"From every person or firm dealing in stocks or bills of exchange in any city or town exceeding 5,000 in population, an annual tax of $250.00; and from any such person or firm in any city or town of less than 5,000 inhabitants, an annual tax of $50.00." Acts of 1871, chap. 52, § 6.

This act was attacked as violative of the provision in the Constitution of 1869 that "taxation shall be equal and uniform throughout the state." In an opinion rendered in 1875, shortly before the convention which framed our present Constitution met, our Supreme Court, speaking through Mr. Justice Moore, laid down the following:

"The particular question for our determination in this case is, whether the law levying the occupation tax for which this suit is brought, violates the constitutional requirement of equality and uniformity, in a tax levied upon persons pursuing any occupation, trade or profession. What rule of practice can be found which is strictly applicable to such a tax? Surely it is not that of a definite sum to be paid by every one upon whom it is levied. Scarcely one could be devised more equal or less uniform for the just and fair apportionment of its burthen among those upon whom it is imposed. A tax thus levied which would be ruinous upon one occupation, would be the merest trifle on another. The same might also be the result if no discrimination could be made between parties engaged in the same general class of occupation. A just and reasonable discrimination in the levy would seem to approach nearer an uniform and equal apportionment of the burthen of the tax among those upon whom it is levied than any other. As the Constitution has laid down no rule by which

the uniformity and equality it requires is to be secured, it is the duty of the Legislature ,to ascertain and determine how it may best be accomplished.

"It has not been made to appear to the court, that it has failed to do so by the law levying occupation taxes. Unless it had, we cannot say the law is in violation of the Constitution. It conforms, with but slight and not very material deviations, to long and uniform usage in the levy of taxes of this character, under our former Constitutions containing the same restriction as these which it is supposed to violate. And it is but reasonable to hold, that these provisions were retained in the present Constitution in view of their receiving the same practical construction as had been previously given them." Texas Banking & Insurance Co. v. State, 42 Tex. 640.

In another opinion on this subject at the same term of that court, by the same justice, the court used the following clear and concise language:

"Equality and uniformity of taxes on occupations, to the approximate extent of which it is reasonably attainable, is required by the Constitution, and is an essential element in the power of taxation. But discrimination in occupations and classifications of them, so far as it has been made to appear to us, seems to be a reasonable and proper rule applied by the Legislature for the purpose of apportioning such taxes with equality and uniformity. Until it is shown that the Legislature has clearly exceeded the limit of their authority and disregarded the restrictions by which it should be controlled, evidently the court cannot interfere." Blessing v. City of Galveston, 42 Tex. 660.

The appellant has set out in its brief an interesting article published by the Galveston News, in 1875, written by the attorney for the appellant in the Texas Banking & Insurance Co. Case, while the constitutional convention was in session, discussing at length the Supreme Court's opinion in that case and appealing to the convention to amend the Constitution so as to prevent in the future any such classification of occupations for purposes of taxation. While interesting, the article is clearly biased, and if it influenced the convention at all, the result was, as shown by sections 1 and 2 of article 8 of the present Constitution, to extend the scope of occupation taxes, and to recognize the power of the state, and that of the county, city, and town to classify occupations for that purpose.

Classifications of occupations for purposes of taxation has been repeatedly recognized under our present state Constitution and under the Constitution of the United States as strictly a legislative function. In passing upon the constitutionality of an act of the Twenty-Ninth Legislature (Acts 29th Leg. c. 148) levying an occupation tax on those engaged in the wholesale business of oil, the Supreme Court of Texas, in the case of Texas Co. v. Stephens, 100 Tex. 640, 103 S. W. 485, used the following language:

"The very language of the Constitution of the state implies power in the Legislature to classify the subjects of occupation taxes and only requires that the tax shall be equal and uniform upon the same class. Persons who, in the most general sense, may be regarded as pursuing the same occupation, as for instance merchants, may thus be divided into classes and the classes may be taxed in different amounts and according to different standards. Merchants may be divided into wholesalers and retailers, and, if there be reasonable grounds, these may be further divided according to the particular classes of business in which they may engage. The considerations upon which such classifications shall be based are primarily within the discretion of the Legislature. The courts, under the provisions relied on, can only interfere when it is made clearly to appear that an attempted classification has no reasonable basis in the nature of the businesses classified, and that the law operates unequally upon subjects between which there is no real difference to justify the separate treatment of them undertaken by the Legislature. This is the rule in applying both the state and federal Constitutions, and it has been so often stated as to render unnecessary further discussion of it."

In Middleton v. Texas Power & Light Co., 108 Tex. 96, 185 S. W. 556, our Supreme Court upheld such a law as follows:

"The classification adopted by the act is not to be held by a court as an arbitrary and unreasonable one. In the enactment of such a law the Legislature was privileged to make a classification in respect to employés subject to the law. Classification for the purpose of a law is a legislative function. It will be sustained by the courts unless it is wholly without any reasonable basis."

See, also, the case of Beaumont Traction Co. v. State, 57 Tex. Civ. App. 605, 122 S. W. 615.

The United States courts have laid down similar rules in numerous decisions. The territory of Hawaii levied an occupation tax upon auctioneers in that territory as follows:

"The annual fee for a license to sell goods, wares and merchandise or other property at auction shall be $600.00 for the district of Honolulu, and $15.00 for each other taxation district."

This law was attacked as being discriminatory and such classification as arbitrary, in that it levied a tax in one district on those pursuing an occupation 40 times as great as that imposed upon those pursuing the same occupation in another district in the territory. In passing on its constitutionality, the United States Supreme Court, in an opinion by Mr. Justice Hughes, says:

"The remaining contention, urged in various forms by the assignments of error, comes to the single point that the statute created an arbitrary classification. It cannot be said, how-

ever, that there was no reasonable basis for a distinction between Honolulu and other districts. And it was the province of the Legislature to decide upon the amount of the fees which should be charged. It must be assumed that in so deciding it took into account varying conditions in the respective localities, as, for example, in the amount of business transacted and in the corresponding value of such licenses. Necessarily, as was said in Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283, 294, the power of classification 'must have a wide range of discretion.' It is not reviewable 'unless palpably arbitrary.' Orient Insurance Co. v. Daggs, 172 U. S. 557, 562; Louisville & Nashville R. R. Co. v. Melton, 218 U. S. 36, 52–55; Engel v. O'Malley, 219 U. S. 128; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78; Mutual Loan Co. v. Martell, 222 U. S. 225, 235." Toyota v. Hawaii, 226 U. S. 184, 33 Sup. Ct. 47, 57 L. Ed. 180.

In the case of Citizens' Telephone Co. v. Fuller, 229 U. S. 322, 33 Sup. Ct. 833, 57 L. Ed. 1206, this subject is discussed at length and numerous cases reviewed by the court. In that case the gross receipts of telephone companies were taxed, but companies whose gross receipts per annum did not exceed $500 were exempted from the operation of the law. The court uses the following language in its opinion:

"It may, therefore, be said that in taxation there is a broader power of classification than in some other exercises of legislation. There is certainly as great a power, and the rule appellant urges cannot be adopted. It is inconsistent with the principle of classification and the cases which have explained the principle and the range of its legal exercise.

"In Bell's Gap Railroad Co. v. Pennsylvania, 134 U. S. 232, 237, it was decided that under the power of classification there might be exemption of property dependent upon its species and the rates of excise might be varied upon different trades and products. And it was said that it was safe to say 'that the Fourteenth Amendment was not intended to compel the state to adopt an iron rule of equal taxation.' It was pointed out that to give it that effect would destroy the constitutional provision and laws of some of the states which, while enjoining uniformity of taxation, permitted exceptions which were deemed material, and that 'it would render nugatory those discriminations which the best interests of society require; which are necessary for the encouragement of needed and useful industries, and the discouragement of intemperance and vice; and which every state, in one form or another, deems it expedient to adopt.'

"In Pacific Express Company v. Seibert, 142 U. S. 339, a distinction, for taxing purposes, between express companies which own their own means of transportation and those who engaged for hire a railroad or steamship company to transport their merchandise, was supported. The range of classification for taxing purposes which was expressed in Bell's Gap Railroad Company v. Pennsylvania and Home Insurance Co. v. New York, 134 U. S. 594, 606, 607, was approved. These cases and others were cited in Michigan Central Railroad

Company v. Powers, 201 U. S. 245, 293, for the same principle of classification and its application to taxation. It was said, 'There is no general supervision on the part of the nation over state taxation, and in respect to the latter the state has, speaking generally, the freedom of a sovereign both as to objects and immunities.' And, further, quoting from the opinion of the lower court, it was said, 'It is enough that there is no discrimination in favor of one against another of the same class, and the method for the assessment and collection of the tax is not inconsistent with natural justice.'

"In Travelers' Insurance Co. v. Connecticut, 185 U. S. 364, a law of the state was sustained which imposed a tax on the stock of nonresidents in corporations and exempted the stock of residents.

"In King v. Mullins, 171 U. S. 404, 435, a distinction was made in the taxing system of the state between tracts of 1,000 acres or less and tracts of more than 1,000 acres. It was sustained.

"In Consolidated Coal Co. v. Illinois, 185 U. S. 203, a law providing for the inspection of mines was held not unconstitutional by reason of its limitation to mines where more than five men were employed at any one time. See, also, McLean v. Arkansas, 211 U. S. 539.

"In New York, N. H. & H. R. R. Co. v. New York, 165 U. S. 628, a law requiring railroads to heat their passenger coaches but exempting roads of less than fifty miles in length was declared not unconstitutional and discriminatory. To like effect is Dow v. Beidelman, 125 U. S. 680, where a classification of railroads by their length in fixing the rate of passengers' fare was sustained.

"In Postal Telegraph Cable Co. v. Adams, 155 U. S. 688, a tax was graduated according to the amount and value of the property measured by miles, and was in lieu of taxes levied directly on the property. Held valid. In Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283, legacies less than a certain amount were held legally exempt from taxation.

"To these cases may be added others. They illustrate the power of the Legislature of the state over the subjects of taxation and the range of discrimination which may be exercised in classifying those subjects when not obviously exercised in a spirit of prejudice and favoritism. Cook v. Marshall County, 196 U. S. 261, 274; Missouri v. Dockery, 191 U. S. 165. The cases decided subsequent to the decision in Bell's Gap Railroad Co. v. Pennsylvania, have applied its principle to many varying instances. Granting the power of classification, we must grant government the right to select the differences upon which the classification shall be based, and they need not be great or conspicuous. Keeney v. New York, 222 U. S. 525, 536. The state is not bound by any rigid equality. This is the rule; its limitation is that it must not be exercised in 'clear and hostile discriminations between particular persons and classes.' See 223 U. S. 59, 62, and 63. Thus defined and thus limited, it is a vital principle, giving the government freedom to meet its exigencies, not binding its action by rigid formulas but apportioning its burdens and permitting it to make those 'discriminations which the best interests of society require.' "

[1, 2] It is clear from these decisions that in passing upon the constitutionality of such a statute, measured either by the state or United States Constitutions, the same test is applied; that is, whether the classification made is essentially arbitrary, unreasonable, and unreal. We have read carefully the cases relied upon by appellant to sustain its contention, but do not find them determinative of this case. The Supreme Court of Missouri, in State of Ashbrook, 154 Mo. 375, 55 S. W. 627, 48 L. R. A. 265, 77 Am. St. Rep. 765, held the Anti-Department Store Law unconstitutional on several grounds, but primarily because the state had levied a tax for the benefit of the municipality in direct contravention of the state Constitution. The court did hold, also, that the attempted classification was unreasonable and unwarranted; but the classification attempted in that case was so obviously different, from that in the instant case as to present little or no comparison. Nor do we think the facts in the cases of the Pullman Palace Car Co. v. State, 64 Tex. 274, 53 Am. Rep. 758, and Ex parte Woods, 52 Tex. Cr. R. 575, 108 S. W. 1171, 16 L. R. A. (N. S.) 450, 124 Am. St. Rep. 1107, present analogous situations. There is no controversy that the general principles laid down in those cases are correct—that when a classification is made it must be reasonable and all those falling within that classification must be subjected to the payment of the tax levied. To the same effect is the holding in the case of Hoeffling v. City of San Antonio, 85 Tex. 233, 20 S. W. 85, 16 L. R. A. 608. Necessarily the conditions prevailing in large cities or in densely populated communities differ from those in small towns or sparsely settled sections, and the question of whether any classification is arbitrary or unreasonable must be determined by the circumstances and conditions under which the particular occupation is pursued.

We think the case at bar is clearly distinguishable from that of Hager v. Walker, 128 Ky. 1, 107 S. W. 254, 15 L. R. A. (N. S.) 195, 129 Am. St. Rep. 238. In that case the Supreme Court of Kentucky held unconstitutional a statute of that state which classified real estate agents. Those doing business in cities or towns of the first, second, and third class were taxed $25 per annum; and those in cities or towns of the fourth, fifth, or sixth class $10 per annum. The Constitution of that state classified the cities and towns. It also contained a provision as to uniformity of taxation within the territorial limits of the authority levying the tax, similar to that provision in our Constitution. In passing upon that question the court uses the following language:

"In the case before us no account is taken of the amount of business done, nor is it pretended that the lack of uniformity and equality in the tax imposed was made to depend upon the quantity of business transacted by the real estate agents taxed. * * * The vice in the law is that, in undertaking to single out for taxation the occupation of real estate agents, it not only taxes them in unequal amounts, depending upon the place in the state where they do business, but also exempts entirely other real estate agents, thus plainly discriminating against real estate agents who live or have a place of business in a city or town, in favor of those who do not live and have no place of business in a city or town." ,

But the occupation of operating a gas plant is one possessing characteristics peculiarly applicable to itself, and in no sense similar in character to that of selling real estate. Such business is usually recognized as a public utility over which municipalities, as in the instant case, exercise powers of regulations. Its very nature, to enable its successful economic operation, demands a monopoly in its community. · Generally speaking, experience has demonstrated that the cost of installation and efficient operation of a gas plant is such that a considerable volume of business is required to justify its existence. In small towns such cost is so out of proportion to the returns from such occupation as to make it impracticable, · if not economically impossible, to pursue it there. The very existence of such occupation must needs depend, upon volume of business, which, generally, is in proportion to the number of inhabitants served. Usually the larger the volume of business done the more economically such occupation can be pursued and the more profitable it thus becomes. All these considerations necessarily enter into the matter of classification and could have been, and doubtless were, considered by the Legislature in arriving at the classification of which appellant complains. The Legislature may have concluded, and perhaps did, that due to its very nature the operation of a gas plant in any place of less than 10,000 inhabitants was so unprofitable as to be economically impracticable, or so nearly so that an occupation tax upon it would render it so. And as stated in Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160:

"When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed."

[3-5] In view of the peculiar nature of the occupation involved and our duty to uphold the acts of the Legislature unless same are clearly in violation of the state or national Constitution, we are not prepared to say that the classification of appellant's occupation is so arbitrary, discriminatory, unreasonable, or unreal as to warrant us in holding it unconstitutional for that reason.

[6] In its second proposition, based upon assignments 7 and 11, appellant contends that the term "gas" as used in the statute means only artificial gas and does not include natural gas. We know of no rule of construction whereby such a conclusion could be reached. "Any gas plant" certainly is broad enough and does include both natural and artificial gas. 4 Words and Phrases (First Series) p. 3044; 2 Words and Phrases (Second Series) p. 702; Indianapolis v. Consumers Gas Trust Co., 144 Fed. 640, 75 C. C. A. 442.

[7] Appellant's third proposition, under assignment No. 12, is that the tax claimed by the state is levied in violation of the interstate commerce clause of the Constitution of the United States (art. 1, § 8, cl. 3). The gas company in its answer alleged that since 1917 at least 75 per cent. of the gas sold by it was brought through pipe lines from the state of Oklahoma and flowed in a steady unbroken flow to the burner tips of the Dallas consumers of appellant; that such gas was procured from the Lone Star Gas Company under a contract, which was attached to and made a part of appellant's answer; and that two-thirds of the gross receipts derived by appellant from the sale of said gas was, under said contract, the property of the Lone Star Gas Company; and that same constituted the proceeds of the sale of a commodity carried and sold by the Lone Star Gas Company in interstate commerce. Said contract described the Lone Star Gas Company as vendor and the appellant as vendee, and provided that the vendor construct a 16-inch main to a point near said city of Dallas, to connect with the appellant's distributing system. We set out the portions of said contract pertinent to the issue raised as follows:

"Third. Subject to the terms and conditions hereof, and to the full extent of the legal capacity, ability and right of these parties to so contract, and to that extent only said vendor hereby agrees to deliver to said vendee, and the latter hereby agrees to receive of the former, at said junction point, such quantity of natural gas as the distributing system of the latter in said city and its suburbs may require, when and as the same may be required, for fifteen years from the 8th day of June, 1910, at and for a price equal to two-thirds of the gross receipts of said vendee from the sales of such gas to such consumers, which price said vendee agrees to pay as hereinafter stated.

"Fourth. Said vendee agrees with said vendor that it will keep proper books upon which shall be kept a true record of all sales of such gas, as registered by the meters of said vendee, and of all moneys received from such sales, and will, on or before the twentieth day of each and every month, make, and render unto said vendor a true and correct statement, and accompany such statement with a payment equal to two-thirds of the gross receipts from the sale of such gas for the preceding month during the continuance of this contract, with a further understanding that the vendor will sell and deliver gas to the vendee for special and manufacturing use at such price less than twenty cents per 1,000 cu. ft. as may hereafter be agreed, providing, in the judgment of the vendor, sufficient gas is developed in its field to warrant its sale for such purposes; it being, however, understood that if said vendor receives as his two-thirds of the gross receipts from gas sold for domestic use less than twenty cents per 1,000 cubic feet, that it shall have the option to cancel this contract by giving ninety days' written notice of such election. All payments to be made for gas delivered during the previous month. * * *

"Eighth. It is mutually covenanted and agreed that said vendor shall erect and maintain, at the junction point hereinafter mentioned, as nearly as practicable, a measuring station equipped with accurate Pilot's tubes for the measuring of gas delivered to said vendee under this agreement, for the purpose of checking the amount of gas delivered with the amount shown by the meters of said vendee, and said vendor will also erect and maintain, at the junction point aforesaid, as nearly as practicable, a reducing and regulating station, to govern and regulate the flow of natural gas and to reduce the pressure of such gas entering the mains of said vendee to the pressure prescribed by the ordinances of said city governing the flow of high pressure and through the streets, alleys and lanes of said city. And each party shall bear one-half of the expense of erecting said measuring and regulating stations, and one-half of the expense incurred in maintaining and operating the same. The measuring and regulating stations shall be subject to the joint control of the parties hereto, and the making of reports and the reading shall be jointly by representatives of each party, copies of the reports to be made daily to each of the parties."

It is not disputed that the Lone Star Gas Company has no interest in the Dallas Gas Company, no authority to do business in Dallas, no control over the contracts between appellant and its consumers, and no right to collect any accounts due appellant by its customers.

We think clearly the title to the gas passed out of the Lone Star Gas Company and into appellant when it passed through the meters at the junction point. Thereafter it came into the possession of the appellant to be disposed of by it in accordance with its charter, and the Lone Star Company exercised no control over it. So long as that portion of it piped from Oklahoma was in the possession of the Lone Star Gas Company, undoubtedly it was interstate commerce and not subject to taxation by the state. But after it was delivered in Texas to a Texas corporation to be sold and distributed by such Texas concern as its own property, an occupation tax upon such sale becomes wholly an intrastate matter. An almost identical situation, certainly one involving the same question, though it arose in a different manner, was presented to the Supreme Court of the United States in the case of

Public Utilities Commission v. Landon, 249 U. S. 236, 39 Sup. Ct. 269, 63 L. Ed. 577. In that case the Kansas Natural Gas Company supplied numerous towns, cities, etc., in Missouri, Kansas, and Oklahoma, with gas procured from wells in Kansas and Oklahoma and transported through pipe lines into another state. Their arrangement with local distributing companies was, in many instances, almost identical with that in the instant case both as to manner of distribution and payment for the gas delivered. The Kansas Gas Company went into the hands of receivers, who sought to restrain public commissioners and officers of Kansas and Missouri from regulating the rates fixed by local distributing companies, on the ground that in doing so they were imposing a confiscatory burden upon interstate commerce. In passing upon this question, the Supreme Court used the following language:

"We think the trial court properly overruled the objections offered to its jurisdiction and nothing need be added to the reasons which it gave. 234 Fed. Rep. 152, 155. But we cannot agree with its conclusions that local companies in distributing and selling gas to their customers acted as mere agents, immediate representatives or instrumentalities of the receivers and as such carried on without interruption interstate commerce set in motion by them.

"That the transportation of gas through pipe lines from one state to another is interstate commerce may not be doubted. Also, it is clear that as part of such commerce the receivers might sell and deliver gas so transported to local distributing companies free from unreasonable interference by the state. American Express Co. v. Iowa, 196 U. S. 133, 143; Oklahoma v. Kansas Natural Gas Co., 221 U. S. 229; Haskell v. Kansas Natural Gas Co., 224 U. S. 217.

"But in no proper sense can it be said, under the facts here disclosed, that sale and delivery of gas to their customers at burner-tips by the local companies operating under special franchises constituted any part of interstate commerce. The companies received supplies which had moved in such commerce and then disposed thereof at retail in due course of their own local business. Payment to the receivers of sums amounting to two-thirds of the product of these sales did not make them integral parts of their interstate business. In fact, they lacked authority to engage by agent or otherwise in the retail transactions carried on by the local companies. Interstate commerce is a practical conception and what falls within it must be determined upon consideration of established facts and known commercial methods. Rearick v. Pennsylvania, 203 U. S. 507, 512; The Pipe Line Cases, 234 U. S. 548, 560. The thing which the receivers actually did was to deliver supplies to local companies. Exercising franchise rights, the latter distributed and sold the commodity so obtained upon their own account and paid the receivers what amounted to two-thirds of their receipts from customers. Interstate movement ended when the gas passed into local mains. The court below erroneously adopted the contrary view and upon it rested the conclusion that the public commissions were interfering with establishment of compensatory rates by the receivers in violation of their rights under the Fourteenth Amendment."

We think this case conclusively disposes of this issue against the appellant. See, also, Penn. Gas. Co. v. Public Service Commission, 252 U. S. 27, 40 Sup. Ct. 279, 64 L. Ed. 434. We have read carefully the Hallanan Cases (Eureka Pipe Line Co. v. Hallanan) reported in 257 U. S. 265, 42 Sup. Ct. 101, 66 L. Ed. 227, and (United Fuel Gas v. Same) 257 U. S. 277, 42 Sup. Ct. 105, 66 L. Ed. 234, and the T. & N. O. v. Sabine Tram Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442, relied upon by appellant, but do not find them in point. The rule laid down in those cases is not in conflict with the Landon Case, above quoted. In these cases the tax or regulation was levied or attempted, almost, if not entirely, at point of origin on property destined for foreign or out of state shipment. They are therefore not analogous to the issue presented in the instant case.

Under its sixteenth assignment and its fourth and fifth propositions based thereon, appellant insists that under said article 7371, even if valid and applicable, it was not contemplated that both the Dallas Gas Company and the Lone Star Gas Company should pay a gross receipt tax on the same identical receipts, and that to do so would be double taxation, unreasonable, discriminatory, and void, and would collect all of the tax from the Dallas Company; whereas, it was entitled under its contract with the Lone Star Gas Company to only one-third of the receipts, the other two-thirds belonging to the Lone Star Company. That therefore the Dallas Company should pay the tax on only the one-third of the gross receipts retained by it.

[8] We think this assignment is without merit. There is nothing in the record to show that the Lone Star Gas Company paid any occupation tax at all. On the contrary, not coming within the classification made in article 7371, it would not be subject to such tax. Nor could it be taxed by the state on its interstate business. It is not the commodity dealt in that is being taxed, but the occupation engaged in. The gross receipts from the sale of gas to Dallas consumers was the property of and the business of the Dallas Gas Company. The Lone Star Gas Company had no authority to collect a single account from a Dallas consumer, and no right to do a gas business in the city of Dallas. The fact that the Dallas Gas Company had contracted with the Lone Star Company to turn over to such company an amount equal to two-thirds of its gross receipts after it had collected its accounts from its customers does not alter the situation, and we find no element of double taxa-

tion involved. This feature of the case is more fully discussed below.

[9] Under its sixth proposition and sixteenth assignment, the appellant asserts error of the trial court in allowing 6 per. cent. interest on the amount of the judgment from its date because interest on taxes is not prescribed by the statute.

We cannot agree with this contention. It is true that our Supreme Court, in Telegraph Co. v. State, 55 Tex. 314, stated the rule to be that, " 'Where action is given for taxes, interest is not recoverable unless the statute gives it,' " and distinguished taxes from ordinary debts. See, also, Cave v. City of Houston, 65 Tex. 619; Edmondson v. City of Galveston, 53 Tex. 157. But in each of these cases the judgment of the trial court was held erroneous because it included interest on the tax itself in arriving at the amount of the judgment. In the instant case, no such interest is included, but the judgment itself is made to bear interest. There is clearly a distinction between a tax due and delinquent and a judgment rendered thereon in favor of the state against the person owing the tax. Article 4981, Revised Statutes, provides as follows:

"All judgments of the several courts of this state shall bear interest at the rate of 6 per cent. per annum from and after the date of the judgment, except where the contract upon which the judgment is founded bears a specified interest greater than 6 per cent. per annum and not exceeding 10 per cent. per annum, in which case the judgment shall bear the same rate of interest specified in such contract and after the date of such judgment."

We think clearly this statute is broad enough to include and authorize interest on a judgment for taxes, even though they bear no interest prior to such judgment. See, also, Finley v. Carothers, 9 Tex. 517, 60 Am. Dec. 179; 22 Cyc. 1519.

In paragraphs 15 and 17 of its amended answer, appellant defended as to two-thirds of its gross receipts on the ground that under its contract with the Lone Star Gas Company such portion was in fact the property and receipts of the Lone Star Gas Company, and that such receipts were largely from interstate business done by said company. These paragraphs of its answer were stricken out upon demurrer, to which action the appellant excepted and assigns error.

Appellant earnestly insists that the undertaking between the Lone Star Gas Company and itself under their contract was in the nature of a bailment with power of sale, or that their contract was an executory agreement not to become executed unless and until there was a sale of the. gas by the Dallas Company. We cannot agree with this interpretation of their contract, the salient portions of which are above set out. The proposition asserted under these assignments is closely akin to that urged under appellant's fourth and fifth propositions discussed above, all of which we think are concluded against appellant by the Landon Case in 249 U. S. 245, 39 Sup. Ct. 268, 63 L. Ed. 577. Under these assignments, however, appellant enters more fully into a discussion of its contract with the Lone Star Gas Company, and cites authorities as to what constitutes a sale, what a bailment, or contract of factorage, and authorities governing interpretation of contracts. The rules laid down in these cases are undoubtedly correct. For this reason we will discuss the issue a little more fully.

[10-12] It is a cardinal rule of construction of contracts that the instrument as a whole is to be looked to to ascertain the intention of the parties. It is also true that words used are to be taken in their generally accepted meaning. We think the contract in question, considered as a whole, clearly discloses a complete sale and transfer of title in the gas to the Dallas Gas Company at the junction point outside the city of Dallas, and that such was the manifest intention of the parties. If that is true, there can be no bailment or factorage as claimed by appellant. In the contract the parties are designated as vendor and vendee. The gas was to be delivered to the appellant. After such delivery the Lone Star Gas Company exercised no dominion over it, but it was to be disposed of by appellant under whatever contracts or terms (except as to manufacturers) appellant saw fit—subject, of course, to charter restrictions and municipal control. No provision was made for the return of any of it to the vendor. The Lone Star Company had no franchise, no interest in the appellant company, and no authority to do any sort of gas business through an agent, as a partner or otherwise within the city of Dallas. It had no privity of contract whatever with appellant's customers, no authority to enforce such contracts with customers, nor to collect any sums due under them. It thus appears that after the gas passed the junction point and into appellant's lines, it became appellant's property with absolute right in appellant to dispose of it as such. The gas was sold, measured, and delivered to appellant at the junction point. Appellant agreed to. pay for it at a price subject to future determination, it is true; but we think that the obligation to pay, though subject to future determination as to the amount, became fixed at the point and time of delivery of the gas to the appellant. The fact that the Lone Star Gas Company agreed to stand loss by leakage of the gas while in appellant's lines and before its final delivery to the consumer did not, we think, change the time the sale was actually consummated. Nor do we agree with appellant's contention that the Lone Star Gas Company owned or was entitled to two-thirds of the gross re-

ceipts from appellant's customers. Appellant agreed to pay said company for the gas delivered "at and for a price equal to two-thirds of the gross 'receipts from the sale of such gas to such customers." There is a vast difference between the words, "price equal to two-thirds of the gross receipts," and, "ownership of two-thirds of the gross receipts." Yet, if appellant's contention as to the meaning of the contract is correct, these expressions would mean the same. We think the meaning is obvious, and further discussion on this point unnecessary.

As above stated, the occupation taxed in the instant case has characteristics peculiar to itself. The product sold must be held captive and can be handled safely in but one way. It is not subject to barter and sale nor to competitive distribution like physical properties usually handled in commerce. Nor can contracts with reference to it always be made in the manner of other contracts. The fact that in the instant case it was a necessity to a large number of people, was to be furnished over a period of 15 years, was recognized as a public utility and the price subject to regulation by the city of Dallas, that the appellant had a monopoly on its sale, all combined to guarantee a ready, stable, and growing market for the product, and all of which either prevented entirely, or else strongly militated against, the possibility of fixing in the contract a definite price to be paid for the gas at the point of delivery to appellant. But the contract provided a method of ascertaining this price which, combined with the positive agreement to pay it, completed the sale of the gas upon its delivery to appellant. We think the trial court properly interpreted the contract, and overrule the assignments.

[13] Appellee, by cross-assignment properly raised, asserts error of the trial court in its refusal to include in the judgment a 10 per cent. penalty. The penalty was prayed for by the state. The trial court should have included it. Article 7387, Revised Statutes 1911, provides the following which applies to the *occupation tax* due by appellant:

"Any person, company, corporation or association, or any receiver or receivers, failing to pay any tax for thirty days from the date when said tax is required by this chapter to be paid, shall forfeit and pay to the state of Texas a penalty of ten per cent. upon the amount of such tax."

Article 7388 also provides for the recovery of such penalty in a suit brought by the Attorney General. The fact that appellant acted in good faith, or did not think it owed the tax, does not relieve it from liability for the penalty, if it in fact did not pay the taxes due by it to the state within the 30 days prescribed by law. Under the undisputed facts in the case, if appellant was due the amount sued for by the state as delinquent taxes, the statutory penalty had accrued, and the judgment should also have included it.

For this reason the judgment of the trial court will be reformed so as to include therein the 10 per cent. penalty prayed for by the state, and will in all other respects be affirmed.

Reformed and affirmed.