## EUREKA PIPE LINE COMPANY *v.* HALLANAN, STATE TAX COMMISSIONER, ET AL.

### ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE OF WEST VIRGINIA.

No. 255. Argued November 9, 1921.—Decided December 12, 1921.

1. A judgment of a state court which sustains a state tax on interstate commerce over the objection that the statute under which it was imposed is unconstitutional, is reviewable here by writ of error, and none the less so because the court below reached its result by construing the statute as applicable to intrastate commerce only and by erroneously classifying as intrastate the commerce in question. P. 270.

2. A pipe line company received oil from producers in West Virginia, subject to their right thereafter to order equal quantities of like grade to be transported and delivered to local destinations, or to extra-state destinations under an interstate tariff, and subject to its duty under the state law to have in its pipes and connected reservoirs enough to satisfy such orders; it charged the producers a storage and gathering charge under the state law; the oil as received became subject to the company's control, was commingled with other like oil, piped through the company's gathering system to its trunk line pipes, and, except for relatively small quantities ordered diverted to local delivery, became part of a stream of oil passing through and out of the State. *Held,* that a tax on the transportation, in so far as measured by the quantities produced in but moving out of West Virginia, was void under the Commerce Clause. P. 271.

87 W. Va. 396, reversed; writ of certiorari denied.

Error to a judgment sustaining a tax in a suit brought by the plaintiff in error to restrain its enforcement. See the next case, *post,* 277.

Mr. *Frank L. Crawford,* with whom Mr. *James M. Beck* was on the briefs, for plaintiff in error.

The oil having been transported in a continuous stream through and out of the State (except as to relatively small portions diverted to refineries within the State), and having at the very outset of its journey been delivered by the producers to, and remained in the custody of, a common carrier (the plaintiff) until so transported, was in interstate commerce from the moment it was received by the plaintiff. *Western Union Telegraph Co.* v. *Speight,* 254 U. S. 17; *United States* v. *Hill,* 248 U. S. 420; *Chicago, Rock Island & Pacific Ry. Co.* v. *Wright,* 239 U. S. 548; *North Carolina R. R. Co.* v. *Zachary,* 232 U. S. 248; *Lottery Case,* 188 U. S. 321; *International Textbook Co.* v. *Pigg,* 217 U. S. 91; *Ohio R. R. Commission* v. *Worthington,* 225 U. S. 101; *Western Oil Refining Co.* v. *Lipscomb,* 244 U. S. 346; *Pennsylvania Gas Co.* v. *Public Service Commission,* 252 U. S. 23; *Pennsylvania Gas Co.* v. *Saxe,* 229 N. Y. 446; *Swift & Co.* v. *United States,* 196 U. S. 375; *Texas & New Orleans R. R. Co.* v. *Sabine Tram Co.,* 227 U. S. 111; *Bracht* v. *San Antonio &c, Ry. Co.,* 254 U. S. 489; *Bailey* v. *Bensley,* 87 Ill. 556; *Coe* v. *Errol,* 116 U. S. 517; *Bacon* v. *Illinois,* 227 U. S. 504; *General Oil Co.* v. *Crain,* 209 U. S. 211; *Standard Oil Co.* v. *Graves,* 249 U. S. 389. Distinguishing: *McCluskey* v. *Marysville & Northern Ry. Co.,* 243 U. S. 36, and *Arkadelphia Co.* v. *St. Louis Southwestern Ry. Co.,* 249 U. S. 134.

In view of plaintiff's operating contracts, and of the Pipe Line Act of West Virginia as construed by its highest court, the delivery by plaintiff to a consignee of a like amount of oil of the same grade in lieu of that re-

ceived, was equivalent in law to delivery of the very oil received. 87 W. Va. 396; *Bailey* v. *Bensley,* 87 Ill. 556; *National Exchange Bank* v. *Wilder,* 34 Minn. 149; *Hall* v. *Pillsbury,* 43 Minn. 33.

In view of such construction by the court below, and of the evidence that the oil, or like amounts thereof, was by its owners intended to be, and actually was, transported through and out of the State, it will be presumed that such oil was received by plaintiff for interstate transportation, and its transportation, therefore, was interstate commerce. *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498; *Worthington Case, supra; Sabine Tram Case, supra; Railroad Commission of Louisiana* v. *Texas & Pacific Ry. Co.,* 229 U. S. 336; *Lipscomb Case, supra.* See *Creswill* v. *Knights of Pythias,* 225 U. S. 246.

Even if the view of the court below were adopted, that the gathering charge covered the service of gathering and conveying the oil to plaintiff's trunk lines, and that for the transportation through its main pipe lines to destination plaintiff charged the further rate allowed by the Interstate Commerce Commission (which is not admitted), still this would only be a case of re-billing en route, and such re-billing would be immaterial in view of the intention of the parties and the general course of business. *Worthington Case, supra; Sabine Tram Case, supra; Lipscomb Case, supra; Atchison, Topeka & Santa Fe Ry. Co.* v. *Harold,* 241 U. S. 371; *South Covington Ry. Co.* v. *Covington,* 235 U. S. 537. But as it was a case of a double charge for one continuous service, it is not necessary to interpret the transaction as one of re-billing.

Where intrastate and interstate transactions are so interwoven, the authority of Congress extends to the whole situation. *Minnesota Rate Cases,* 230 U. S. 352, 381, 382,

399; *Southern Ry. Co.* v. *United States,* 222 U. S. 20; *Erie R. R. Co.* v. *Winfield,* 244 U. S. 170; *Philadelphia & Reading Ry. Co.* v. *Polk,* 256 U. S. 332.

*Mr. Fred O. Blue* and *Mr. S. B. Avis,* with whom *Mr. E. T. England,* Attorney General of the State of West Virginia, and *Mr. Wm. Gordon Mathews* were on the brief, for defendants in error.

There is not drawn in question the validity of a statute of or an authority exercised under any State, on the ground of their being repugnant to the Constitution, treaties or laws of the United States, with the necessary decision in favor of such validity, so as to justify review here by writ or error; nor is there drawn in question any title, right, privilege or immunity claimed under the Constitution, treaties or laws of the United States, so as to justify review by certiorari. The claim of plaintiff is, in effect, that because the oil is a lawful subject of interstate commerce, it may neither be subject to a tax, nor made the measure of a tax, prior to the determination by its owner that it shall be placed in interstate commerce.

The court below was correct in holding that it was the legislative intent to impose a tax only upon the intrastate transportation of the plaintiff and measured by the amount of such commerce. *Quong Ham Wah Co.* v. *Industrial Accident Commission,* 255 U. S. 445; *Kehrer* v. *Stewart,* 197 U. S. 60; *Pullman Co.* v. *Adams,* 189 U. S. 420; *Platt* v. *New York,* 232 U. S. 58; *Barrett* v. *New York,* 232 U. S. 14; *Louisville &c. Ry. Co.* v. *Mississippi,* 133 U. S. 587; *Peik* v. *Chicago &c. R. R. Co.,* 94 U. S. 164; *Osborne* v. *Florida,* 164 U. S. 650. This construction and interpretation is binding upon this court. *Elmendorf* v. *Taylor,* 10 Wheat. 152; *Quong Ham Wah Co.* v. *Industrial Accident Commission, supra.*

The gathering, running and transporting of oil from wells to delivery points in West Virginia, not tendered for

shipment but held subject to the order of the owner, is an intrastate service. Until the oil is tendered for shipment, the plaintiff's relation thereto is that of bailee, not carrier. Not being committed to interstate commerce, it is subject to taxation by the State to the owners thereof until committed to such commerce. The essential character of the transaction, and not the purpose or mental state of the owners, determines whether state or national law applies. *New York Central R. R. Co.* v. *Mohney,* 252 U. S. 152; *McCluskey* v. *Marysville & Northern Ry. Co.,* 243 U. S. 36; *Arkadelphia Co.* v. *St. Louis Southwestern Ry. Co.,* 249 U. S. 134; *General Oil Co.* v. *Crain,* 209 U. S. 211; *Gulf, Colorado & Santa Fe Ry. Co.* v. *Texas,* 204 U. S. 403; *Coe* v. *Errol,* 116 U. S. 517.

The business of plaintiff under consideration is intrastate, and was so regarded and treated by it. *Pennsylvania R. R. Co.* v. *Knight,* 192 U. S. 20, is controlling. [Distinguishing many of the cases relied on by plaintiff in error.]

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill to prevent the enforcement against the plaintiff of a statute of West Virginia that forbids engaging in the business of transporting petroleum in pipe lines without the payment of a tax of two cents for each barrel of oil transported. Acts of 1919, Extraordinary Session, c. 5. It is set up that the statute is contrary to the Constitution of the United States in several ways, one of these being that as applied to the plaintiff it imposes a tax upon commerce among the States. The plaintiff owns a system of pipe lines in West Virginia connecting with other pipe lines in Ohio and Kentucky on the west and in Pennsylvania on the east of the State. Through the plaintiff's pipes oil flows in a continuous stream to the state line and beyond—in all amounting to over twenty-two million barrels in the year ending June 30, 1919. There are four

grades of the oil thus moved. Two of these are produced partly in West Virginia. According to the figures accepted by the defendants in error, out of a total 9,076,599.83 barrels of the Pennsylvania grade 6,510,081.51 barrels came from this State, upon over six millions of which the plaintiff made a charge of twenty, later thirty, cents for gathering, on an interstate tariff and also under a local statute. But all the oil of the same grade was mixed, regardless of source, and of the Pennsylvania grade only 1,239,099.55 barrels were used in West Virginia. It is admitted that the tax may be levied in respect of the last item, but the question before us is whether the tax can be laid upon the whole product of the State upon which was imposed the gathering charge.

The Circuit Court of the State held that the statute was void. The Supreme Court of Appeals sustained it so far as the oil produced in West Virginia was concerned. But as the Court declared that the act should be construed to apply only to commerce within the State it is urged that there is no jurisdiction here of the writ of error because there is no question as to the validity of a statute so limited. The plaintiff in error also applied for a writ of certiorari so that the objection would be immaterial were we not required to determine upon which proceeding the decree should issue. In view of that necessity we dispose of the matter before going further. Upon the declaration of the Court we may conjecture that if it had considered that the oil in question moved in interstate commerce it would have agreed with the Court below, and on this ground it is argued that the mistake, if any, was not in approving the statute but in the Court's conception of interstate commerce. But we must look at what the Court has done, not at its mode of reaching the result. What it has done is to decide that the statute covers all the oil produced in West Virginia and that it shall be upheld in so doing. The nature of the mistake that in-

duced the act is immaterial. A case would not be withdrawn from the jurisdiction of this Court in error by a declaration that a statute was addressed only to intrastate commerce if it was applied wholesale to freight passing across the continent. The fact that the error was less does not affect the principle involved. But furthermore the Court only confined the statute to intrastate commerce "as above defined," that is, to commerce that embraced what the plaintiff carried on.

We return to the facts affecting the merits. When oil is received from the producer he receives a credit on the books of the plaintiff pipe line, and thereafter is charged for storage, as it is called, the plaintiff being required by the laws of West Virginia to keep enough oil in its tanks and pipes to satisfy such credits. Code, 1913, § 3564. If the producer desires to deliver oil outside the State it hands to the pipe line company what is called a tender of shipment for so many barrels of the specified kind of oil, naming the consignee, and expressed to be subject to an identified tariff filed with the Interstate Commerce Commission. This is said to be a joint tariff in which the connecting carriers share, but they do not share in the twenty or thirty cents charged for gathering the oil. The argument for the defendants in error of course is that the producer is free to sell within or without the State and that the movement of gathering having taken place before any order is given and while the producer still can do as he likes, it must be regarded as intrastate.

It does not seem to matter for the question before us, whether the delivery to the pipe line be regarded as making it the owner of what it receives and a debtor for the amounts, as in the case of a bank, or as akin to those transactions that are held to make the recipient a bailee of the mingled mass and the bailors tenants in common, as seems to have been assumed. Whether debtor or bailee the pipe line controls the movement of any specific oil in

its hands and the bailor assents to its doing so. The bailor assents to its becoming part of a stream that is pouring through and out of the State. Its only right is to call on the pipe line to divert a portion of that stream. So far as the oil that it calls for goes out of the State with the general current it seems to us not to be distinguishable from the rest admitted to move in interstate commerce. No bailor has title to any specific oil, and to deny the character of interstate commerce to the whole stream simply because some one might have called for a delivery that probably would have been made from it in an event that did not happen, is going too far. The charges for gathering and storage seem to us not to affect the case. The storage merely means that enough oil must be kept in the tanks and pipes to satisfy credits. The oil runs into a tank on one side and out on the other. The tank may be regarded as a pipe of larger size. Whether the plaintiff in error was right or wrong in relying upon state law for its gathering charge its attitude does not matter here.

As has been repeated many times, interstate commerce is a practical conception, and, as remarked by the court of first instance, a tax to be valid "must not in its practical effect and operation burden interstate commerce." It appears to us as a practical matter that the transmission of this stream of oil was interstate commerce from the beginning of the flow, and that it was none the less so that if different orders had been received by the pipe line it would have changed the destination upon which the oil was started and at which it in fact arrived. We repeat that the pipe line company not the producer was the master of the destination of any specific oil. Therefore its intent and action determined the character of the movement from its beginning, and neither the intent nor the direction of the movement changed.

*Decree reversed.*
*Writ of certiorari denied.*

MR. JUSTICE CLARKE, dissenting.

I greatly regret that I cannot concur in the opinion and judgment of the court in this case, and I think it is my duty to state briefly as I may the grounds of my dissent.

The Eureka Pipe Line Company is a West Virginia corporation, owning pipe lines which are wholly within that State. Of the twenty-two and a half millions of barrels of oil which the company transported in the year in controversy, ending July 1, 1919, six and one-half millions of barrels were produced in West Virginia and the remainder came from other southern and western States. Of that produced in West Virginia, one and one-quarter millions of barrels were delivered to refineries in that State, and the balance was delivered to connecting carriers, at the state line, for interstate transportation. There is no controversy as to the oil from other States or as to the state-produced oil that was delivered to refineries in the State; but to the holding of the court that the state-produced oil, which ultimately went out of the State, moved in interstate commerce from the time it left the wells, I cannot agree.

The company owns about forty-three hundred miles of pipe line in West Virginia, all of which, with the exception of a few hundred miles of main or trunk line, is used for the purpose of "gathering" oil from twenty-seven counties of the State,—it covers them as with a network.

The admitted method of doing business was as follows: When the oil was delivered by the producer to the company, it issued to him what is called a "credit balance," which was a paper reciting that he had credit on its books for the designated number of barrels of oil and it contained a blank for the entry of "storage charges." The oil thus delivered moved to some one of several points on the main lines of the company, all within the State and designated in the record as "central points," or "delivery

points," or " tariff points." This movement of the oil was under a tariff filed by the company with the State Public Service Commission, which, in the year under discussion, read:

" *Local Tariff.* The rates named in this tariff are for *intrastate* transportation of crude petroleum."

. " For gathering and transporting oil from wells to delivery points within the State of West Virginia, 20 cents. Storage, per day, 1/40th cent."

Thus, by the contract between the parties, the oil was received for transportation to points within the State only. No consignee or destination was named, but, on the contrary, a charge was provided for indefinite storage, which the record shows was often paid, and the parties united in calling this part of the transportation a " Local and an intra-state shipment."

Further, in order to give the oil any intrastate delivery the owner was required to issue to the company a paper called a " delivery order," but, if he wished it to move in interstate commerce he must deliver to the company an entirely different order called a " tender of shipment," which was a paper naming a place of delivery outside the State and reciting that the transportation should be under a designated interstate tariff.

. All transportation of the oil before the issuing of the " tender of shipment " was under the local tariff described. It was not released for transportation or delivery of any kind, either state or interstate, until a " delivery order " or a " tender of shipment " was delivered to the company by the owner and when the latter was delivered the oil moved thereafter under the terms of another, a joint interstate tariff, filed with the Interstate Commerce Commission at Washington by the Eureka Company, in conjunction with other companies owning lines connecting with its mains at the state line.

To this we must add that, as a West Virginia corporation, the Eureka Company was subject to the statute of that State, requiring that any company engaged in the transportation of petroleum in the State shall not in any manner ship or transport, or permit to be shipped or transported, or in any manner remove from the tanks or pipe lines of such company, any petroleum without a written order (a " delivery order " for intrastate, or a " tender of shipment " for interstate, delivery); and also that every such company " shall at all times have in their pipes and tanks an amount of merchantable oil equal to the aggregate of outstanding . . . . credit balances, on the books thereof."

If this were all there was in the transaction, plainly the oil could not be considered as moving in interstate commerce until a " tender of shipment " was issued, for until that time it was without a consignee or destination and was held under a local tariff, providing a rate of twenty cents per barrel for intrastate transportation, and a charge for storage.

But the court concludes that this plainly intrastate shipment is converted into an interstate shipment by a single circumstance, viz: that when the oil, thus moving under a local tariff for a local charge, reached the trunk line, if that line happened to be " running " oil of the same kind and quality, the local oil was turned into the main and was at once moved out of the State, even though a " tender of shipment " may not have been issued to release it and give it destination. It is to be noted, however, that if the company was not " running " oil of the like kind and quality when the local oil reached the trunk line, it was held at the junction (tariff point) until like oil was to be " run " again, when it was sent forward. This may have been for a day or for two weeks.

This circumstance, that the oil became under these conditions a " part of a stream that is pouring through

and out of the State," it is held, gave the shipment an interstate character from the moment it left the wells. This holding is adopted, says the court, as a "practical conception" of the matter, but it is precisely because it seems to me a too highly technical conception to find place in the world of practical business, that I dissent from such a conclusion. It is true that the physical oil moved, as stated, out of the State, but its removal without a tender of shipment caused no reduction whatever in the volume of like oil in the State; that volume, by the statute, by the contract of the parties and by the tariff filed by the company, must continue undiminished to meet all outstanding "credit balances" and the evidence of the assistant superintendent of the company is that this requirement was constantly complied with. The conclusion of the court, therefore, allows the mere business convenience of the company (it saves storage tankage) to convert into interstate commerce that which all the parties, by their contract and conduct treated, and charged and paid for, as an intrastate transportation, and thereby subordinates, in my judgment, the substance to the merest form of the transaction.

Believing, as I do, that this transporting of oil over approximately four thousand miles of "gathering" lines in the State to the trunk lines, was a local shipment, as the parties all declared it to be, I think the State should be permitted to impose a reasonable license or occupation tax upon the company engaged in such extensive state activity, measured by the volume of such traffic, and that the judgment of the Supreme Court of Appeals of West Virginia restraining the statute to this scope should be affirmed.

For the reasons stated in the dissenting opinion of Mr. Justice Brandeis in No. 30 of this term, *Dahnke-Walker Milling Co.* v. *Bondurant, post,* 282, I think this case is subject to review in this court only upon writ of certiorari,

and that, therefore, the motion to dismiss the writ of error should have been granted, but it has seemed to me important to discuss, as I have done, the question of interstate commerce involved.

MR. JUSTICE PITNEY and MR. JUSTICE BRANDEIS join in this opinion as to the merits of the controversy. MR. JUSTICE BRANDEIS also concurs as to the question of jurisdiction.