## EASTERN GULF OIL CO. v. KENTUCKY STATE TAX COMMISSION et al.

(District Court, E. D. Kentucky. March 31, 1926.)

**1. Courts ⚓366(1)—Decision of highest state court that state statute does not violate state Constitution binds federal courts.**

Decision of highest state court that state statute does not violate state Constitution is binding on federal courts.

**2. Courts ⚓366(2)—Federal court must exercise its own judgment in determining whether state taxing statute violates federal Constitution.**

Whether state taxing statute violates federal Constitution depends on its real nature and effect, and, in determining what that is, federal court must exercise its own judgment and be governed thereby.

**3. Licenses ⚓1—State tax under former statute on right or privilege of producing oil in state, based on market value of oil produced, held "occupation tax" (Acts Sp. Sess. Ky. 1917, c. 9).**

Tax levied by Acts Sp. Sess. Ky. 1917, c. 9, before its amendment by Acts 1918, c. 122, imposing "license or franchise" tax on those engaged in business of producing oil in the state, for right or privilege of engaging in such business, measured by market value of oil produced, held "occupation tax."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Occupation Tax.]

**4. Mines and minerals ⚓73—In Kentucky, grantee of oil lease acquires ownership of oil in land.**

In Kentucky, grantee of oil lease acquires ownership of oil in the land, as well as right to search for and produce it when found; effect of grant being to sever oil from land.

**5. Licenses ⚓1—State occupation tax under former statute on production of oil held in lieu of property tax on oil in place and right to produce it; "wells" (Acts Sp. Sess. Ky. 1917, c. 9).**

Acts Sp. Sess. Ky. 1917, c. 9, before amendment thereof by Acts 1918, c. 122, imposing occupation tax on oil produced in state "in lieu of all other taxes on wells * * * imposed by law," provides for occupation tax in lieu of property tax on oil in place and right to produce such oil from wells on producer's grant, and exemption is not limited to actual "wells," in sense of holes or shafts sunk to obtain oil.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Well.]

**6. Licenses ⚓7(1)—State occupation tax under former statute on production of oil held not violative of federal Constitution (Acts Sp. Sess. Ky. 1917, c. 9).**

Acts Sp. Sess. Ky. 1917, c. 9, before its amendment by Acts 1918, c. 122, imposing occupation tax on production of oil in state in lieu of all other property taxes on oil in place and right to produce it, held not violative of federal Constitution.

**7. Taxation ⚓1—State statute imposing tax on oil produced, payable by pipe line company after it leaves producer, held "property tax" (Acts Ky. 1918, c. 122).**

Acts Ky. 1918, c. 122, constituting Ky. St. §§ 4223c1–4223c9, requiring producers of oil in state to pay tax on market value of oil produced in lieu of all other taxes on producing wells, tax to attach when oil leaves producer's possession and comes into that of pipe line company, and to be paid in first instance by transporter, held "property tax" on oil transported, notwithstanding title of act recited that it "amends and re-enacts" Acts Ky. 1917, c. 9, levying occupation tax on production of oil, and decision of Kentucky Court of Appeals that it imposes license or occupation tax.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Property Tax.]

**8. Commerce ⚓72—State statute, taxing oil produced after it leaves producer and enters interstate commerce, held violative of commerce clause (Acts Ky. 1918, c. 122).**

Acts Ky. 1918, c. 122, constituting Ky. St. §§ 4223c1–4223c9, imposing property tax on oil produced in state, payable in first instance by pipe line company after it has left producer's possession, with right to reimbursement from producer, held violative of interstate commerce clause of federal Constitution as respects oil pumped directly from producer's tanks into pipe lines for distribution in interstate commerce, and it is immaterial that producer, and not pipe line company, complained of tax.

**9. Commerce ⚓63—Even if state statute taxing oil produced, measured by market value after it passes into interstate commerce, is occupation tax, it violates commerce clause (Acts Ky. 1918, c. 122).**

Even if Acts Ky. 1918, c. 122, constituting Ky. St. §§ 4223c1–4223c9, imposing tax on oil produced in state, measured by value of oil after it has left producer's possession and passed into that of transporter in interstate commerce is occupation tax, and that property tax, it is violative of commerce clause of federal Constitution.

In Equity. Suit by the Eastern Gulf Oil Company against the Kentucky State Tax Commission and another, to enjoin collection and enforcement of certain taxes. On plaintiff's motion for interlocutory injunction. Motion granted.

Robert H. Winn, of Mt. Sterling, Ky., and John A. Judy, of Lexington, Ky., for plaintiff.

Frank E. Daugherty, Atty. Gen., and Chas. F. Creal, and Overton S. Hogan, Asst. Attys. Gen., for defendants.

Before DENISON and MOORMAN, Circuit Judges, and COCHRAN, District Judge.

PER CURIAM. This suit is here on motion for an interlocutory injunction. It is a three-judge case, and involves the validity

of chapter 122, Acts Kentucky 1918, approved March 29, 1918, and carried into sections 4223c1 to 4223c9, inclusive, of Carroll's Kentucky Statutes (6th Ed.) 1922. These sections constitute subdivision 111b, entitled "Oil Production," of article 12, entitled "License Tax," of chapter 108, entitled "Revenue and Taxation," of those Statutes. The injunction, which is sought, is to restrain the defendant Kentucky State Tax Commission from assessing, collecting, and certifying taxes, and the defendant Daugherty, Attorney General of the State, from instituting any prosecution, against plaintiff, under the legislation referred to.

[1] It is claimed by plaintiff that this legislation is in violation of both the federal and the state Constitution. It has been held by the Kentucky Court of Appeals not to be in violation of the state Constitution. Raydure v. Board of Sup'rs of Estill County, 183 Ky. 84, 209 S. W. 19; Associated Producers Co. v. Board of Supervisors, 202 Ky. 538, 260 S. W. 335; Swiss Oil Corporation v. Shanks, 208 Ky. 64, 270 S. W. 478. These decisions are binding upon this court, and it is not open for it to consider whether it is in violation thereof. Dawson v. Kentucky Distilleries & Whse. Co., 255 U. S. 288, 41 S. Ct. 272, 65 L. Ed. 638.

That court has not considered the question whether it is in violation of the federal Constitution. In the Swiss Oil Corporation Case it was urged upon it that it was in violation thereof, but it waived that question, holding that its determination was not necessary to the disposition of the case before it. The suit there was not, as here, to enjoin the taking of action under the legislation in question, but to recover taxes which had been paid thereunder. That legislation was, according to its title, an amendment to and re-enactment of previous legislation, to wit, chapter 9, Acts Sp. Sess. Ky. 1917, approved May 2, 1917. It is not open to claim that the original legislation was in violation of the federal Constitution, and the same tax was due under it as under the existing legislation. If, then, for this reason, the latter is invalid, the original legislation is still in force, and the taxes paid were due under it. Such, then, was the reasoning which led that court to hold that a determination of the federal question was not necessary to the disposition of that case.

[2] That question is raised by this suit and the motion before us. As to whether the legislation in question violates the federal Constitution depends upon its real nature and effect and, in determining what that is, this court is bound to exercise its own judgment in regard thereto and be governed thereby. In the case of Choctaw, O. & G. R. Co. v. Harrison, 235 U. S. 292, 35 S. Ct. 27, 59 L. Ed. 234, it was said: "Neither state courts nor Legislatures, by giving a tax a particular name, or by the use of some form of words, can take away our duty to consider its real nature and effect." And in the case of St. Louis S. W. R. Co. v. Arkansas, 235 U. S. 350, 35 S. Ct. 99, 59 L. Ed. 265, it was said: "But when the question is whether a tax imposed by a state deprives a party of rights secured by the federal Constitution, the decision is not dependent upon the form in which the taxing scheme is cast, nor upon the characterization of that scheme as adopted by the state court. We must regard the substance, rather than the form, and the controlling test is to be found in the operation and effect of the law as applied and enforced by the state."

The particulars in which it is claimed by plaintiff that the legislation in question violates the federal Constitution are two. It violates the provision conferring on Congress the power to regulate interstate commerce, in that it imposes a tax on oil produced by it after it gets and whilst it is in interstate commerce, and the due process clause of the Fourteenth Amendment, in that it does not provide for a hearing of plaintiff by the defendant commission as to the value of such oil.

[3] In determining the real nature and effect thereof, it is essential that a determination be first had of the real nature and effect of the original legislation, to wit, the act of 1917. There can be no question that the tax which it imposed was an occupational tax. Its title is in these words: "An act imposing a license or franchise on any person, firm, corporation or association engaged in the production of oil in this state and authorizing counties also to impose such tax for road, school and county purposes; providing methods of determining the amount of tax due and prescribing penalties for a violation of the provisions of the act."

Here it is expressly characterized as a "license or franchise" tax imposed upon those "engaged in the production of oil in this state." The first section is in these words:

"Every person, firm, corporation, or association engaged in the business of producing oil in this state, by taking same from the earth, shall, in lieu of all other taxes on the

wells producing said oil imposed by law, annually pay a tax for the right or privilege of engaging in such business in this state equal to 1 per centum of the market value of all oil produced in this state, and such tax shall be for state purposes, and in addition any county in the state may impose a like tax for road purposes, county purposes or school purposes not to exceed one-half of one per centum of the market value of all oil produced in such county, and the fiscal court of any county may levy said tax for county purposes and shall determine what fund or funds shall receive the taxes when collected, and when oil is produced in any separate taxing district in a county the fiscal court shall equitably distribute such taxes between the county and such taxing district."

It will be noted that those on whom the tax is imposed are described as "engaged in the business of producing oil in this state," and that the tax is imposed "for the right or privilege of engaging in such business in this state." The tax which is imposed is measured by "the market value of all oil produced in this state."

In the case of Brown-Foreman Co. v. Commonwealth, 125 Ky. 402, 101 S. W. 321, it was held that an occupational tax can be measured by the quantity of that which is produced by the person taxed; i. e., in the exercise of the occupation because of which he is taxed. This decision was affirmed by the Supreme Court. Brown-Forman Co. v. Kentucky, 217 U. S. 563, 30 S. Ct. 578, 54 L. Ed. 883. It was held by the Court of Appeals of Kentucky in the earlier case of Strater Bros. Tob. Co. v. Commonwealth, 117 Ky. 604, 78 S. W. 871, that such a tax can be measured by the value of that which is so produced.

There is another clause in this section which calls for interpretation. It is that in which it is said that the tax imposed is to be "in lieu of all other taxes on the wells producing said oil imposed by law." The question which this clause raises is as to what were the taxes which were had in mind in lieu of which the occupational tax is imposed. In considering this question, two things should be borne in mind. One is that the occupational tax imposed by the act has relation to development or producing oil grants. It has no relation to grants which have not been developed and are not producing oil in paying quantities. The taxation of the latter grants, where they are owned by nonresidents of the counties where the real estate covered by them is located, whether nonresidents of the state or not, is provided for by section 4039, Carroll's Kentucky Statutes (6th Ed.) 1922. And where owned by residents of such counties their taxation is provided for in section 4020 thereof, as held in Raydure v. Board of Sup'rs of Estill County, supra. Those provisions are not limited to nondeveloped grants, but embrace developed grants as well. However, as to the latter the taxation would seem to be of the oil in place, and not as produced. Wolfe County v. Beckett, 127 Ky. 252, 105 S. W. 447, 17 L. R. A. (N. S.) 688.

[4] The other thing referred to is the nature of the interest of the grantee in an oil lease, which should preferably be termed a grant. The Supreme Court has held that he has no interest in the oil in place, but only a right to search for it, and to produce it, if found. This it so held on the ground of the fugacious nature of oil. Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729. This court fell in with this view in the case of Lindlay v. Raydure (D. C.) 239 F. 928, 933. In this state, however, this is not the law. The grantee acquires ownership of the oil in the land, as well as such right. And the effect of the grant is to sever the oil from the remainder of the land. Wolfe County v. Beckett, supra; Raydure v. Board of Sup'rs of Estill County, supra. This is the law as held by the majority of the courts, according to the note in 29 A. L. R. 586.

[5] We come now to the question as to what are the taxes had in mind in lieu of which the occupational tax is imposed. It is the taxes "on the wells * * * imposed by law." The Standard Dictionary defines a well to be "a hole or shaft sunk into the earth in order to obtain a fluid, as water, oil, brine, or natural gas, from a subterranean supply." But of course the word "wells" in that clause is not to be taken literally. It was not taxes imposed on holes drilled to find oil, and from which oil is produced, if found, in lieu of which the occupational tax was imposed. That word, as thus used, stands for something else, and the question is, What does it stand for? It can stand for the oil produced from the wells. But it does not stand for that, because the taxes on the wells in lieu of which the occupational tax is imposed are taxes "imposed by law." And there was then no production tax on oil in this state; i. e., a tax imposed on oil after it has been produced. It can only stand for the oil in place, covered by the grants upon which the wells are located,

and the right to produce such oil from those wells, upon which, as we have seen, taxes were "imposed by law."

That such was the meaning of the clause is evidenced from the opinion in the case of Wolfe v. Beckett, in the light of which that clause is to be interpreted. The main question involved there was as to the assessability of developed oil grants. The item in the assessor's list, prepared by the state and furnished the taxpayer, under which the grants were listed, was "Coal Mines, Oil, Gas and Salt Wells." That question was thus put, "Are oil and gas wells held under lease taxable?" It was held that they were assessable. But what it was held was assessable was not the wells, or the oil produced from the wells. It was the oil in place in the land covered by the grants upon which the wells were located, and the right to produce such oil therefrom. Here, both in the tax list and in the opinion of the court, the word "wells" was treated as standing for such oil in place and such right. And it would seem that, in the light of this opinion, the word "wells" in the clause in question stands therefor and nothing else. The only tax "imposed by law," in lieu of which the occupational tax could be imposed, was a tax on the oil in place and such right.

The question under consideration is not whether the Legislature could constitutionally impose an occupational tax in lieu of such property tax. It is what the Legislature meant. Of course, if it could not constitutionally do this, that circumstance has a bearing on the question of what it meant. Because thereof it should not be held that it meant this, if there is any reasonable escape from so holding.

So much, then, as to the first section of the Act of 1917. It has eight other sections. Those sections have to do with the determination of the value of the oil produced, which is the measure of the amount of the tax to be paid and the payment of the tax. By section 2 it is provided that the state tax commission shall determine such value and that it shall certify its valuation to the county court clerk. It provides that such determination shall be made from the reports provided for in sections 7 and 8 and such other information as it may obtain. By section 3 provision is made for the state tax commission notifying the taxpayer of its valuation, and for a hearing in regard thereto before it, at his instance. Section 4 provides the time of payment of the taxes and a penalty for nonpayment. Section 5 provides for the certification of the county taxes to the sheriff for collection. Section 6 provides that the state taxes shall be paid to the state treasurer and the county taxes to the sheriff. Section 7 provides that the taxpayer shall make report to the state tax commission of the oil produced by him on the 1st day of July, 1917, and every three months thereafter, on blanks furnished by the state tax commission, and prescribed a penalty for not making them. Section 8 provides that every pipe line company doing business in the state shall at the same time make report on such blanks of the oil received by it, and prescribes a penalty for not so doing. Section 9 related to the blanks to be so furnished, and provided who should make the reports called for by sections 7 and 8, and for prosecution for the making of a false report.

It is clear, therefore, that what the act of 1917 provided was an occupational tax, to be measured by the oil produced, and that this tax should be in lieu of the property tax, for which he was liable on account of his ownership of the oil in place and the right to produce same from the wells located on his grant. Whether the state Legislature could, under the state Constitution, so provide, and, if not, the effect of its inability so to do—whether it overthrew the whole statute or only in part—it is not for us to say. We are only concerned with a right interpretation of the acts, and this in order to get the right point of view from which to interpret the statute of 1918, on whose correct interpretation the question whether it violates the federal Constitution in either of the particulars claimed depends. For in interpreting a document its subject-matter must be looked at from the right point of view. There is but one method of interpretation of a document, and that is the historical method. One, however, in using it, should bear in mind that it is possible for one to be too proud of such method.

[6] It should be noted, in passing, that there was nothing in this act infringing upon the federal Constitution.

[7] This brings us to the act of 1918, which is directly involved here. The title thereof is in these words:

"An act to amend and re-enact chapter 9 of the Acts of the Extraordinary Session of the General Assembly of 1917, which act imposes a license or franchise on any person, firm, corporation, or association engaged in the production of crude petroleum in this state, and authorizing county officials to impose such tax for roads, schools and county

purposes; providing methods of determining the amount of tax due and prescribing the manner of payment of state tax and imposing penalties for the violation of the act."

It is to be noted that the act which it says imposes a license or franchise is not that of which it is the title, but the earlier one. The description of the former is that it is an act "to amend and re-enact" the latter. It will be seen, when we come to consider the provisions thereof, that it does not re-enact any of the provisions of the previous act, and only amends the first section thereof. What it does is to substitute 10 entirely new sections for the 8 sections following that first section, and to amend it. The amendments to the first section have significance, and, when considered in connection with the remaining 10 sections, it is well-nigh impossible to resist the conclusion that what the act of 1918 does is to substitute an entirely different tax for that provided for in the act of 1917; i. e., property tax for an occupational one. Note will first be taken of the amendments to the first section of the act of 1917. The first section of the act of 1918 is in these words:

"Every person, firm, corporation or association producing crude petroleum oil in this state, shall, in lieu of all other taxes on the wells producing said crude petroleum, annually pay a tax equal to 1 per centum of the market value of all crude petroleum so produced, and such tax shall be for state purposes, and, in addition, any county in the state may impose a like tax for road purposes, county purposes or school purposes not to exceed one-half of one per centum of the market value of all crude petroleum produced in such county, and the fiscal court of any county may levy said tax for county purposes and shall determine what fund or funds shall receive the taxes when collected, and, when crude petroleum is produced in any separate taxing district in a county, the fiscal court shall equitably distribute such taxes between the county and such taxing district."

The changes made in the first section of the act of 1917 by this section, apart from the change in the name of the substance from that of oil to "crude petroleum," consist entirely in omissions, and there are four of them. The words "engaged in the business of" and "by taking same from the earth" are omitted, so that, instead of reading "Every person, firm, corporation or association, engaged in the business of producing oil in this state by taking same from the earth," it reads "Every person, firm, corporation or association producing crude petroleum oil in this state." The words "imposed by law" are omitted, so that, instead of reading "in lieu of all other taxes on the wells producing said oil imposed by law," it reads "in lieu of all other taxes on the wells producing said crude petroleum." And finally the words "for the right or privilege of engaging in such business in this state" are omitted, so that, instead of reading "annually pay a tax for the right or privilege of engaging in such business in this state equal to 1 per centum of the market value of all oil produced in this state," it reads "annually pay a tax equal to 1 per centum of the market value of all crude petroleum so produced."

There is hardly room to say that these omissions were unintended. They must have been made of purpose. Possibly they may have been omitted, because unneeded; i. e., surplusage. But it is hard to account for the last one on this ground. It is the most significant one of them all. If the thought of the act was that the tax imposed was not an occupational tax, as under the act of 1917, but a property tax, this accounts for the omission. It looks as if the omission was because it was conceived that the tax imposed by that act was not for the right and privilege of engaging in the business of producing crude petroleum, as in case of the tax imposed by the act of 1917. If not that, what other tax can it be than a tax on the crude petroleum produced; i. e., a property tax? With this coincide the first two omissions. They indicate that the eye of the section was fixed on what is produced, and not on the business of producing it, or the act of taking it from the earth.

This view of the section makes it conform to the other 10 sections, which are entirely new, and take the place of the 8 later sections of the act of 1917, as will shortly appear. It is not so easy to account for the other omission, to wit, the words "imposed by law." It may have been made because those words were mere surplusage; i. e., added nothing to the thought of the section. They made certain that the taxes in lieu of which the occupational tax was imposed by the act of 1917 were taxes imposed by existing law. Possibly one tax cannot be said to be imposed in lieu of another tax, unless such other tax is imposed by existing law. This omission, therefore, may not be stressed. But, as will be seen later, this in lieu clause was afterwards construed to mean what it could hardly have been held to mean, had

the omission not been made, and it had been worded exactly as it stood in the first section of the act of 1917.

This first section provided that the producer shall pay the tax; but the other 10 sections provide for its payment by the pipe line company, which is termed all through these sections "the transporter." It is the transporter who is primarily liable for and to pay the tax, with the right to reimburse itself from the producer. The contemplation of the first section, therefore, is that the producer shall pay the tax only secondarily; i. e., to the transporter. It is to the transporter, and to it alone, that the state and the counties look for the payment of their taxes. And, as will be seen, so far as it is concerned, the tax is a property tax, and not an occupational one.

By section 2 provision is made for a county, which imposes a tax, as authorized by the first section, giving notice to the transporter of such imposition, and for the transporter collecting the tax and paying it to the sheriff in the manner and at the time payment of such taxes shall be required to be made to the state tax commission. It also provides for a certification of the imposition of the tax to the state tax commission, which is to make assessment therefor, in the same manner and at the same value as provided for the state tax, and a certification of such assessment to the county for collection.

Section 3 is in these words: "The tax hereby provided for shall be imposed and attach when the crude petroleum is first transported from the tanks or other receptacles located at the place of production." According to this the tax is not imposed, and does not attach, as long as the oil is in the possession of the producer. It is imposed, and attaches, only when it is first transported; i. e., removed from its possession and the act of transportation has begun.

By section 4 each transporter is required to register in the clerk's office in each county in which it carries on the business of transportation, in a book furnished by the state tax commission, and the county clerk is required to certify such registration to the state tax commission.

Section 5 provides that each transporter shall make monthly reports to the state taxing commission, showing the quantity of each kind or quality of petroleum received from each county, the market value thereof, and any sales thereof, on blanks furnished by the state tax commission. It requires no report of the producers, whose petroleum it

has received and transported, or of their respective interests in the petroleum transported by it. The report covers merely the quantity received each month, without any reference to whom it belongs. The state tax commission has nothing to do with the producers, and has no dealings whatever with them. The dealings with the producer are by the transporter, and by it alone.

Section 6 makes provision for the assessment by the state tax commission of the value of the petroleum so received by the transporter upon the reports made by it, as provided in the preceding section, and such other reports and information as it may secure. The provision is that the commission shall "assess the value of all grades or kinds of crude petroleum so reported," notify each transporter of "such assessment," and certify "such assessment" to the county clerk of each county, who is immediately to deliver a copy thereof to the sheriff, for the collection of the county tax from the transporter. Provision is made for a hearing by the commission of the transporter "on any objection to such assessment." · No provision is made for the hearing of the producer. It is not regarded that he has any concern in the matter.

It further provides the manner in which the commission "shall make the assessment of the value of the crude petroleum so reported by each transporter of crude petroleum." It is as follows: "Where the report shows no sale of crude petroleum during the month covered by such report, then the market value of crude petroleum on the first business day after the tenth day of the month in which the report is made shall be fixed as the assessed value of all crude petroleum covered by such report. But where the report shows sales of crude petroleum during the month covered by such report, if it shows that all crude petroleum so reported has been sold, then the market price of such crude petroleum on each day of such sale or sales shall be the assessed value of all crude petroleum sold on such date of sale and the total amount of the tax to be reported as the assessment on such report shall be the total of the assessment or assessments made on such sale or sales; but if such report shows that any part of the crude petroleum so reported remains unsold, then as to such portion remaining unsold the market price of the crude petroleum on the first business day after said tenth day of the month following the month covered by such report, shall be fixed as the assessed value of such portion of

the crude petroleum unsold, and the total amount of the tax to be reported as the assessment on such report shall be the total of the assessments made on such sold and unsold crude petroleum."

Section 7 provides that the transporter "shall be responsible and liable for the taxes as herein set forth on all crude petroleum so received by it, and shall collect from the producer, in either money or crude petroleum, the taxes imposed under the provisions of this act; but, if collection is in crude petroleum, such transporter is authorized and empowered to sell the same, and pay said taxes by check or cash to the state tax commission."

Section 8 provides that the state tax commission may require reports from all producers and transporters, in addition to those theretofore provided for, "as it may deem necessary, from time to time."

Section 9 prescribes a penalty against a transporter for failure to make reports, to pay taxes, or to register as required by the act.

Section 10 repeals all acts and parts of acts in conflict therewith.

Section 11 contains an emergency provision.

It is clear, therefore, that what these later sections—i. e., those after the first—provide is for the payment of taxes by the transporter on the crude petroleum transported by him, and hence a property tax. The first section is to no extent in conflict therewith, and seems to have been changed by amendment from what it was in the act of 1917, in order to conform thereto as heretofore pointed out. What we have, then, in this act, is a tax levied against a custodian of personal property, analogous to the tax assessed against distillery warehousemen on account of whisky in their possession, but not owned by them, as provided in article 6 of the chapter entitled "Revenue and Taxation," Kentucky Statutes, which has been held to be valid. Carstairs v. Cochran, 193 U. S. 10, 24 S. Ct. 318, 48 L. Ed. 596; Anderson County v. Kentucky Distilleries & W. Co. (C. C.) 146 F. 999; Thompson v. Commonwealth, 123 Ky. 302, 94 S. W. 654, 124 Am. St. Rep. 362; Thompson v. Kentucky Commonwealth, 209 U. S. 340, 28 S. Ct. 533, 52 L. Ed. 822. The difference between that case and this is that here the transporter is engaged in interstate commerce, and the crude petroleum taxed against it is being transported in interstate commerce.

This interpretation of the act of 1918 runs counter to that of the Court of Appeals of Kentucky in each one of the three cases of Raydure v. Board of Sup'rs of Estill County, supra, Associated Producers' Co. v. Board of Sup'rs, supra, and Swiss Oil Corporation v. Shanks, supra. Whilst, as heretofore stated, it is our duty to be governed by our own interpretation of the real nature and effect of the tax imposed thereby, it is due to the court, from which we feel constrained to differ, to take note of the basis of its position and consider how persuasive it is. Then it is always helpful to consider a view contrary to one's own position. It enables him to make sure thereof and define it more clearly.

In the Raydure and Associated Oil Producers' Cases, the main, if not only, question involved was as to the meaning and validity of the "in lieu" clause of the first section. In interpreting that clause it was dealt with as it is in the act of 1918, and not as it is in the act of 1917; i. e., as reading "in lieu of all other taxes on the wells producing said crude petroleum," and not "in lieu of all other taxes on the wells producing said oil imposed by law." It thus was not brought forcibly before the court that the tax in substitution of which the tax called for by the act was imposed was a tax imposed by existing law. In the Raydure Case, the board of supervisors of Estill county had assessed all of Raydure's oil grants outside of five acres around each producing well. It took the portions thereof covered by the five acres as the only portions drained by the wells. In other words, it took such portions to be the developed portions of the oil grants, and all outside thereof as the undeveloped portions. It was the undeveloped portions which they had assessed. This assessment was ad valorem, and in order to a collection of a property tax thereon. It was of this assessment, and of it alone, that Raydure complained. He did not complain of the tax imposed by the act of 1918.

Amongst other grounds upon which he attacked the assessment was that the property assessed was covered by the "in lieu" clause, and hence was not assessable. This raised both the question of the meaning of the clause and its validity under the state Constitution. The court held that it did not cover the undeveloped portion of an oil grant; i. e., that the word "wells" therein stood for the developed portion of an oil grant. It further held that, if it covered the undeveloped portion, it was in violation of the state Constitution, because, though

thereunder it is allowable for the Legislature to add an occupational tax to a property tax, it is not allowable for it to substitute the one for the other. Neither one of these holdings was a dictum. The latter, as much as the former, was a matter decided. The latter holding rendered the in lieu clause unconstitutional also as to the developed portion of an oil grant, which it was taken to cover, as much so as to the undeveloped portion, had it been broad enough to cover it. An occupational tax could no more be substituted for such property tax than for the other.

The question, however, as to the validity of a property tax on the developed portion, was not before the court, and the effect of what had been held as to its validity was not clearly perceived. So the court concluded its opinion with this paragraph:

"On a return of the case the court should hear evidence and find the fair cash value of each lease, excluding the value of each producing well thereon estimated at the price it would bring at a fair voluntary sale and then assess it. The quantity of land that should be excluded in connection with each well we express no opinion concerning."

The case also involved the nature of the interest of a grantee in an oil grant, and in disposing of that question the decision in the case of Wolfe v. Beckett, supra, was considered and followed. That the decision in that case had a bearing on the interpretation of the in lieu clause was not realized. Had the court realized and read the clause as it is in the act of 1917, it might have held that the word "wells" in that clause stood, not merely for the developed portion of an oil grant, but for the entire oil grant, upon which producing wells are located, and based its decision solely on the unconstitutionality of the in lieu clause.

Such, then, was what was decided in that case, and all that was decided. It did not involve the meaning of the act of 1918 as to the nature of the tax imposed by it or its validity. That tax was not in question in the case. The only tax in question was the property tax on what was taken to be the undeveloped portions of the Raydure grants. Whatever may have been its nature, the in lieu clause was invalid if it covered such portions thereof. It is not allowable for the Legislature to exempt such property from an ad valorem tax on any ground whatever. This, perhaps, should be qualified. Possibly the Legislature may provide for an oil production tax—i. e., a tax on the oil as produced—and further provide that such a tax may be in lieu of any tax on it in place, so as not to tax it twice. But otherwise it was entirely immaterial to the case as to what was the nature of the tax imposed by the act or as to its validity.

The court, however, did consider the nature of the tax so imposed, possibly on the ground that it had a bearing on the interpretation of the in lieu clause, though it did not pass on its validity as that was not involved and could not be. It held it to be an occupational tax. It said: "The tax provided for in this legislation was a license tax on the business and not a property tax." In the course of the opinion it referred to the tax, interchangeably, as an "oil production tax" and "a license tax." It is once referred to as "a license tax on the business of engaging in the production of oil," but it is more frequently referred to as an "oil production tax." There would seem to be confusion here, for, strictly speaking, an "oil production tax" is a property tax, and not an occupational one; i. e., it is a tax on the oil as produced, and not whilst in place.

The distinction between the two comes out in the cases of Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237; Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929. The one involved a coal production tax; i. e., a tax on coal produced, at its value when ready for shipment or market. The other involved a tax upon the occupation of producing ore; the tax to be measured by its value "where it was brought to the surface of the earth." In the last case it was said: "We think the tax in its essence is what the act calls it—an occupational tax. It is not laid on the land containing the ore, nor on the ore after removal, but on the business of mining the ore, which consists of severing it from its natural bed and bringing it to the surface, where it can become an article of commerce and be utilized in the industrial arts." It was held in each case that the tax was not a regulation of interstate commerce, and therefore valid.

The sole basis for the position which the Kentucky Court of Appeals took, as to the nature of the tax, is thus stated: "This (i. e., that the tax was an occupational and not a property tax) is made plain by the title of the act of 1917, which reads 'An act imposing a license tax or franchise on any person, firm, corporation or association engaged in the production of oil in this state and authorizing counties also to impose such tax;

* * * providing methods of determining the amount of tax due, * * *' and by the title of the act of 1918, which is an amendment of the act of 1917, and recites that it is 'An act to amend and re-enact * * * the acts * * * of 1917, which imposes a license or franchise on any person, firm, corporation or association engaged in the production of crude petroleum in this state' thus showing very plainly the nature and purpose of the act."

It was not noted that the description of the act, as one imposing a license or franchise tax, was confined to the title of the act of 1917. The description of the act of 1918, in its title, was not as one imposing any tax, but as an amendment and re-enactment of the act of 1917. In what particular it changed the former act, and its exact nature, other than its relation to that act, is not obtained from its title.* That can only be obtained from the body of the act itself. The description of the act of 1917 in its title was correct. That in the act of 1918, in so far as it described it as a re-enactment of the act of 1917, was not correct, as we have seen. It re-enacted no provision of the act of 1917, and, on the contrary, radically changed its nature. No other reference to the original acts was made than to their titles. If it were not for this reference, one would think that the court did not have before it either act in its original form, but only the act of 1918 as carried into the Kentucky Statutes, for its attention was concentrated on the first section thereof as embodied in the Kentucky Statutes, to wit, section 4223c1. It is the only portion to which it made reference. It is, therefore, true to say that the act of 1918 was not construed by the court as a whole.

The effect of the ten later sections on the construction of the first section, as showing that the tax thereby imposed was not primarily payable by the producer, was not conceived of. Still further, so far as the act of 1918 was concerned, it was not construed from the point of view of the act of 1917. It was not realized how apt that act was in imposing an occupational tax; i. e., how every one of its provisions conformed to that conception of it, and how radically different therefrom is the act of 1918, and that in every section thereof. No notice was taken of the striking omissions from the first section of the act of 1918 of certain language used in the first section of the act of 1917, the reasonable explanation of which is that it was not intended that the tax imposed by the act of 1918 should be a tax "for the right

or privilege of engaging in the business" of producing crude petroleum (i. e., an occupational tax), as was the tax imposed by the act of 1917, but a tax on the crude petroleum produced (i. e., a property tax), and that in the hands, not of the producer, but of the transporter, to which conception thereof all the other sections conform.

After the decision in the Raydure Case, the taxing authorities were not long in perceiving that, under the reasoning of that case, the developed portion of an oil grant, as well as the undeveloped, was subject to a property tax, and they acted accordingly. It was out of this situation that the Associated Producers' Co. Case arose. That case, just like the Raydure Case, involved the question as to the meaning and validity of the in lieu clause. This was the only question which it did involve. It did not involve any question as to the nature of the tax imposed by the act of 1918, or its validity. It could not have been involved, for the Associated Producers' Company was not complaining of that tax. It was complaining of the property tax on the developed portion of its oil grant. And the validity of that tax depended on the meaning and validity of the in lieu clause, and nothing else. It could not escape that tax, unless that clause covered such property tax, and it was constitutional for it to do so. The court held against the Associated Producers' Company on both questions. It held that the Legislature had no power to relieve it of such property tax, and furthermore that it did not intend to do so, as the in lieu clause did not cover it. It construed that clause to mean that "there should be no other license tax." What it did in effect was to substitute for the words of the clause, to wit, "in lieu of all other taxes on the wells," the words "in lieu of all other license taxes." This it could hardly have done, had it had before it the clause as it was in the act of 1917; i. e., "in lieu of all other taxes on the wells * * * imposed by law." The only taxes imposed by law were property taxes, which covered both the developed and undeveloped portions of an oil grant. There were no license taxes imposed by existing law in lieu of which the tax called for by the act could be imposed.

Both these matters, to wit, the invalidity of the in lieu clause, if it covered the developed portion of an oil grant, and the meaning thereof, were points decided in the case. Neither holding was a dictum. It would seem, however, to follow that, if the construction put upon the clause was sound, the tax

imposed by the act was valid, under the state Constitution, as there was no reason on this view of it for holding it invalid. In no other way did the decision in that case have any bearing on the validity of the tax imposed by the act of 1918.

But the court, as in the Raydure Case, passed on the nature of the tax imposed by that act, and followed it in holding that it was an occupational tax. It confined its consideration to the act of 1918, and, as to it, to its first section as contained in the Kentucky Statutes, to wit, section 4223c1. It did not construe that act as a whole, or look at it from the point of view of the act of 1917. This is what is said: "It is clear from the statutes (section 4223c1), no less than from the opinion in the Raydure Case, supra, that the tax intended to be imposed was merely a production or license tax. It could be nothing more." And again: "The section of the statute to which we have reference relates merely to a production or excise tax, so we held in the Raydure Case, supra."

Here we have also, as in the Raydure Case, a production tax and a license or excise tax treated as the same. Beyond question, the holding in this case that the developed portion of an oil grant, as well as the undeveloped portion, was subject to the property tax, and that it was not relieved therefrom by the in lieu clause, was right, and no exception can be taken thereto.

The Swiss Oil Corporation Case was the first of the three to involve the validity of the tax imposed by the act of 1918. It was directly involved in that case, because it was a suit to recover the tax which had been paid. The question of its validity under the federal Constitution was waived, as heretofore stated. It was held to be valid under the state Constitution, and that not on the merits, but because of the decisions in the other two cases, and the action taken by the taxing authorities and taxpayers in pursuance of them. We would submit, however, that the validity of this tax was in no wise involved in either of those cases. What was involved therein was the validity of the in lieu clause. The question as to the validity of that clause was not the same as that as to the validity of the tax imposed by the act. It was held that the clause was valid in both cases. It was so held in the Raydure Case because it was considered that that clause did not cover the undeveloped portion of the oil grant, and in the Associated Producers' Co. Case because it was considered that the in lieu clause did not cover a property tax

and was limited to other license taxes, which might thereafter be imposed. So far as the decision in the Raydure Case is concerned, though it had no bearing on the validity of the tax in question, the court's acquiescence in the position that the in lieu clause covered the developed portion of an oil grant may be said to have had a bearing on the validity of the tax. Its bearing, however, was against its validity, and not in favor thereof. If it did cover such portion of an oil grant, it was invalid, and its being invalid rendered the tax invalid, not because it was unconstitutional, but because the Legislature did not intend to impose the tax, except in lieu of the property tax.

But the decision in the Associated Producers' Co. Case, though it did not involve the validity of the tax in question, had a bearing on its validity. If the construction placed upon the in lieu clause was sound—i. e., that it only covered license taxes, that might afterwards be imposed—then the tax imposed was valid under the state Constitution, if of the character which it was held to be. There was no ground to hold it invalid.

What the court was really confronted with the Swiss Oil Corporation Case was whether it would stand by this construction. This it in effect did. It held the tax to be an occupational tax, and to be valid as such under the state Constitution. In considering its nature, as in the Associated Producers' Co. Case, it confined itself to the consideration of the act of 1918, and, as to it, to its first section as contained in the Kentucky Statutes, to wit, section 4223c1. It did not construe that act as a whole, or look at it from the point of view of the act of 1917. Indeed, in portions of the opinion, that section is treated as if it constituted the whole of the act of 1918. It is said: "Section 4223c1 of the Statutes, under which the taxes that appellant seeks to compel the auditor to refund were laid and collected, is an act of the 1917 session of the Legislature, as amended at the 1918 session." And again: "This conclusion disposes of appellant's contentions that the act of 1917, as amended, in 1918 and now section 4223c1 of the Statutes, imposes a property tax, rather than a license tax."

We find nothing, therefore, in these three cases, to change our view as to the real nature of the tax in question, which view has been arrived at by construing the act of 1918 as a whole, and that from the point of view of that of 1917.

[8] It remains to consider and determine whether the act is in violation of the federal Constitution. We limit ourselves to the claim that it violates the interstate commerce provision thereof. We conclude that it does. It does so, because it imposes a tax on the producers'. oil after it gets, and whilst it is, an interstate commerce. According to the allegations of the bill, which are not questioned, the producers pump the crude petroleum directly from the wells to tank receptacles, and then deliver the oil directly from those receptacles into the pipe lines of the transporters, and same is transported by them immediately and directly from those receptacles, without any intervening handling, storage, or delay in continuous flow in interstate commerce to destinations and for sale and distribution in states other than Kentucky. The tax attaches after the crude petroleum has left the possession of the producers, and come into the possession of the transporters, and has become an article being transported in interstate commerce. According to section 3, it attaches when it is "first transported from the tanks or other receptacles located at the place of production." That the imposition by a state of a tax on an article being transported in inter-. state commerce is a regulation of such commerce, and therefore invalid, is well settled.

In 26 R. C. L. p. 130, § 105, the law is thus stated: "Goods being carried in interstate commerce are not taxable by a state while they are actually in transit." The matter is thus put· by Mr. Justice Moody, in a dissenting opinion in the case of General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754: "Cases of taxation upon property before it has entered the channels of interstate transportation, or after the transportation has finally ended, seem to me to have no application. In the former class the property is taxable because it has not ceased to be a part of the mass of the property of the state, and in the latter class because it has come to rest as a part of the mass of the property of the state. Between those two points of time it is exempt from the taxing power of the state."

This is all the more so, if it should be so that after the oil leaves the possession of the producer, and passes into that of the transporter in interstate commerce, it becomes the property of the latter, and the latter becomes accountable to the former for its value. The possibility of such being the case was intimated by the Supreme Court in the case of Eureka Pipe Line Co. v. Hallanan,

257 U. S. 265, 42 S. Ct. 101, 66 L. Ed. 227, where it said: "It does not seem to matter, for the question before us, whether the delivery to the pipe line be regarded as making it the owner of what it receives and a debtor for the amounts, as in the case of a bank, or as akin to those transactions that are held to make the recipient a bailee of the mingled mass and the bailors tenants in common, as seems to have been assumed. Whether debtor or bailee the pipe line controls the movement of any specific oil in its hands and the bailor assents to its doing so." That the pipe line company is not here complaining of the imposition of the tax is unimportant. The plaintiff's interest therein is sufficient to entitle it to be heard on the matter.

[9] If,· however, we should be mistaken in our view of the nature of the tax, and it is an occupational and not a property tax, still the legislation cannot be upheld. The amount of the tax to be paid is measured by the value of the oil produced, not whilst it is in the producer's possession, but after it has left its possession and ,passed into that of the transporter, and has become an article in interstate commerce. All that saved the occupational tax in the Oliver Iron Mining Co. Case, above, was that the amount to be paid was measured by the value of the ore when it was brought to the surface of the earth, and before it had passed into interstate commerce.

It must be held, therefore, that the plaintiff is entitled to the interlocutory injunction sought.