## UNITED STATES of America
### v.
### MILTON MARKS CORPORA-TION, Appellant.
#### No. 11909.

United States Court of Appeals Third Circuit.

Argued Sept. 28, 1956.

Decided Jan. 31, 1957.

Abraham Fishkin, Pittsburgh, Pa. (Frank Reich, Pittsburgh, Pa., on the brief), for appellant.

Hubert S. Teitelbaum, Asst. U. S. Atty., Pittsburgh, Pa. (D. Malcolm Anderson, Jr., U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

Milton Marks Corporation is here appealing its conviction and sentence to pay a $5,000.00 fine for violating the False Claims Act.[1] A jury found the corporation guilty of presenting to the United States a fraudulent claim for payment in connection with the sale of a quantity of carbine cartridge clips to the government. On this appeal the principal contention of the corporation is that it was entitled to a judgment of acquittal or a new trial because of the insufficiency of the evidence to support the conviction.

The alleged false claim was made in an invoice covering approximately 100,000 small disposable metal clips, designed for holding ten rounds of .30 calibre ammunition and conveniently loading the shells into a carbine. These clips were shipped April 20, 1953 in two lots numbered 34 and 35. This shipment was made in part performance of a contract to supply the government with some ten million such clips, which were manufactured by the corporation and delivered to the government over a period of more than a year, beginning late in 1952.

1. The statute reads:
"Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 287.

It is not disputed that, under date of April 20, 1953, the corporation, representing the goods as satisfying contract specifications, submitted an invoice and billing for payment of the contract price for lots 34 and 35. To establish the falsity of this claim and its fraudulent character the government attempted to prove that the corporation, acting through its general foreman, Peter Pane, had willfully caused a large quantity of defective clips to be included in the lots in question. As a matter of law, proof of such misconduct by the general foreman, who was shown to have been in charge of the production and shipment of the articles in question, would sustain a charge of corporate criminality. Cf. New York Central & H. R. R. R. v. United States, 1909, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613; United States v. Armour & Co., 3 Cir., 1948, 168 F.2d 342. The seriously disputed question is whether there was evidence, sufficient under our standard of proof in criminal cases, to establish that Peter Pane willfully caused the inclusion of a substantial quantity of defective clips in lots 34 and 35.

We consider first the evidence offered to show that the lots in question did in fact contain a great number of defective clips when they left the factory. It has already been stated that these lots were shipped on April 20, 1953. A few days later, between April 23rd and April 28th, government inspectors examined the entire contents of thirteen boxes, part of the ninety-one boxes, each containing approximately 1100 clips, which constituted lots 34 and 35, and found about 35 per cent of these clips to be defective. For reasons which do not appear, a similar detailed inspection of the remaining boxes was not made until much later. Indeed, some of the boxes were not inspected until more than a year after shipment. However, eventually the total number of defective clips in lots 34 and 35 was found to be about 20,000 or some 20 per cent of the total shipment. It will be noted that this overall percentage was less than the 35 per cent of defective items found in the boxes first opened a few days after shipment. Thus, though the delay in inspecting many of the boxes was a fact for the jury to consider, the results of inspection both soon and long after delivery afforded substantial basis for an inference that defective clips in large numbers were included in lots 34 and 35 as assembled by the manufacturer for shipment. Cf. Nye & Nissen v. United States, 9 Cir., 1948, 168 F.2d 846, affirmed 1949, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919.

In an effort to avoid this inference appellant points to proof that lots 34 and 35 had passed a sampling inspection by a government inspector at its plant. But there is much more evidence concerning procedures, including appellant's own inspections, during the performance of this contract which minimizes the significance of sampling clearance and affirmatively suggests intentional inclusion of defective clips in a way calculated to escape discovery. Specifically, there was testimony that from time to time the foreman, Pane, had instructed employees to put rejected clips at the bottom of boxes being packed for shipment; that the foreman himself had been seen putting rejects into such boxes; that he had caused the substitution of defective clips for good ones in a box which had passed sampling inspection by a government inspector in the plant; that late in the afternoon, after the government inspector had left the plant, the foreman had been observed directing workers to discontinue the final assembly of parts which articulated properly and to substitute parts which were ill fitting rejects or otherwise known to be defective. In addition, there was evidence that more than 350,000 defective units had been manufactured by the corporation and that these units unassembled were in the plant less than a month before the shipment of lots 34 and 35.

Appellant makes much of the fact that no witness was able to identify any box in which defective clips had intentionally been placed as part of lots 34 and 35. However, twelve or more wit-

nesses testified about incidents of deliberate use of defective clips. Four of these witnesses were shown to have worked in April 1953, at or about the time the lots in suit were assembled and shipped. More important, repeated deliberate inclusion of rejects and other defective clips in lots being prepared for shipment from time to time warranted an inference that this was a practice which characterized the corporation's performance of its contract and accounted for the high percentage of defective units found in lots 34 and 35. Cf. Nye & Nissen v. United States, supra; Roberts v. United States, 4 Cir., 1943, 137 F.2d 412, certiorari denied 320 U.S. 768, 64 S.Ct. 80, 88 L.Ed. 459.

All of appellant's contentions considered, we think the evidence amply justified the verdict.

The judgment will be affirmed.