UNITED STATES of America

v.

THOMPSON–POWELL DRILLING COMPANY et al.

Cr. A. No. 1064.

United States District Court
N. D. Texas,
Lubbock Division.

Jan. 2, 1961.

W. B. West III, U. S. Atty., Clayton Bray, Asst. U. S. Atty., Fort Worth, Tex., for plaintiff.

Baker, Botts, Andrews & Shepherd, Houston, Tex., Scott, Hulse, Marshall & Feuille, El Paso, Tex., Crenshaw, Dupree & Milam, Lubbock, Tex., for defendants Standard Oil Co. of Texas and Pasotex Pipe Line Co.

DOOLEY, District Judge.

### Preliminary Statement

This is a prosecution under the Connally Hot Oil Act. 15 U.S.C.A. § 715 et seq. The defendants include several corporations and a number of individuals, with variations in the number and identity of the particular defendants named from count to count, there being 18 counts, in the indictment. The two defendants being dealt with in this present determination are the Standard Oil Company of Texas (Standard) and Pasotex Pipe Line Company (Pasotex), both corporations of Delaware. Most of the individual defendants were employees of one or the other of said two corporations. The locale is the Kelly-Snyder Field in Scurry County, Texas, a major oil reservoir, where the discovery well was drilled in 1948 by the Standard, which was the owner of the largest single block of leases located in said field.

The Standard derives most of its oil production from operations in Texas and owns a large refinery at El Paso, Texas, used to serve a marketing area in Texas, New Mexico and Arizona, and it is a subsidiary of the Standard Oil Company of California. Pasotex is a wholly owned subsidiary of Standard, and since 1950 it has owned and operated a pipe line gathering system serving a large number of leases in the said field, and its facilities include two pumping stations designated as No. 1 and No. 2, as well as a transportation pipe line from said field to El Paso. During the period involved in this case, the Pasotex system was handling approximately 800,000 barrels of oil a month, mostly from lease tanks in the field and all of such oil was transported for the account of Standard to El Paso, where it was used in the refinery for the recovery of gasoline and other products. The Standard marketed about one-half of such products in Texas and the other one-half in New Mexico and Arizona. That part of the gasoline output of the refinery marketed in New Mexico and Arizona was transported from El Paso into New Mexico and some on into Arizona by another pipe line, a facility of the Standard Products Pipe Line, a division of the Salt Lake Pipe Line Company, which was a wholly owned subsidiary of the Standard Oil Company of California.

In the meantime, the Kelly-Snyder Field was unitized on March 1, 1953, as Sacroc Unit, under which the previously owned holdings of the Standard, represented lease by lease, became a blanket interest of about 18.5% throughout the whole Unit, and it became, and continued to be, the operator of the North part of such Unit, known as Segment 1.

The defendant, Claude J. Thompson, now deceased, or one or more of the defendant corporations identified with him by name, owned or operated leases containing all together seven producing wells, which were drilled after the formation of the Sacroc Unit, and were located along or near the boundary thereof, but outside the said Unit. Three of said wells, the best known as York B, had been completed before July 1, 1955, and not only the York B but also the other two were capable of producing their allowable output of oil for a time after completion, but by July 1955, only the York B retained such productive capacity and the other two had become deficient wells. The other four of the seven wells mentioned, the best being known as the VFW well, were completed one a month successively in August, September, October and November 1955, and for a time after completion not only the VFW well but also the other three were capable of

making their allowables, but the other three wells lost such capacity within a relatively short time, becoming deficient wells by January 1956, and only the VFW well retained the capacity to produce its allowable. In fact, the York B and the VFW wells were capable of producing much more than their respective allowables at the times pertinent in this action. The said seven wells were all connected to the Pasotex gathering system shortly after same, respectively, were completed, and the production from such wells went first to the Pasotex Station No. 2 and then, in turn, was forwarded therefrom to Station No. 1, which in due course pumped such oil, as well as other oil collected at the last named station, into the Pasotex pipe line for transportation.

The Standard, as operator in Segment 1 of the Sacroc Unit, was in charge of production of oil from all the wells in such segment, and accordingly was in charge of the wells on certain tracts in the segment formed from what had been known as the Mrs. Jesse Brown leases, and such constituent tracts numbered fourteen. The Pasotex gathering line connected with the wells on such Brown tracts, unlike the line to the Thompson wells, moved the oil directly to Pasotex No. 1, rather than intermediately through Pasotex Station No. 2.

The present prosecution has to do with alleged acts or omissions pertaining, in some instances exclusively, to the Thompson wells and in one instance pertaining exclusively to the Brown wells, but a bridge is posed in several other instances, due to the Government's theory that oil from the Brown leases was used to cover a shortage at the Pasotex Station No. 1 traceable to credits made at Pasotex Station No. 2 for fictitious production from five of the Thompson wells. This circumstance is reflected in the contemporaneous aspect of Counts 4, 5, 6 and 7 in one group and Counts 9, 10, 11 and 12 in another group.

The first fifteen counts in the indictment charge interstate transportation of *contraband* oil. In some of such counts the said italicized word is used to mean oil production over the lawful allowable of the given well, and in other instances the word is used to mean not necessarily oil produced over the lawful allowable, but equally well to mean oil otherwise unlawfully produced from a given well, and such inclusiveness is relevant in connection with production from the Brown leases, where the Government's contention is that if such oil, whether or not over the allowable of the Brown leases, was wrongfully credited, not to the real producing wells, but instead to the depleted Thompson wells, then it was contraband oil.

*Counts 1, 2, 3, 5, 6 and 7*

The proof is quite clear, in fact the defendant does not deny, that contraband oil was produced and run, at least in the approximate amounts and from the named wells, during the months of July, August and September 1955, respectively, as alleged in Counts 1, 2 and 3. The same thing is true under Counts 5, 6 and 7 for the months of December 1955, January and February 1956. All of such oil, in the approximate amounts alleged, was purchased by Standard and transported by Pasotex in its pipe line from the field to El Paso, where same was delivered to Standard and the path of such movement was wholly within the State of Texas. One Hart, a pipe line gauger for Pasotex, was aware of the contraband production alleged in Counts 1, 2 and 3, in fact he took part in the devious means used, acting in collusion with one Ware, an employee of the operator of the wells identified in said Counts. His activity was to credit oil produced by one well to another well and this served to avoid showing overproduction of the one well and, at the same time, the credited weak well did not reflect any infraction of its allowable limit. The duties of Hart were to gauge tanks and receive oil for transportation by Pasotex. The Pasotex collected its regular rate and tariff on this contraband oil, the same as any other oil run in its pipe line at or about the same time in question from the field to El Paso.

The same thing in substance, with much difference in detail, was true in re-

spect to the subject oil mentioned in Counts 5, 6 and 7 of the indictment. In this instance, however, the gauger employee of Pasotex was one Morgan. There is no serious denial, however, of the fact that contraband oil, at least in the approximate amounts stated in said last named three Counts, was produced, purchased by Standard, received into the Pasotex pipe line and transported to El Paso, and again Pasotex collected its tariff freight charges on the shipments.

The defendant Pasotex relies on two points in defense against the aforesaid six counts of the indictment, to wit:

1. That its gaugers, respectively, acted in collusion with an outside party, did things contrary to company policy and breached the scope of their employment, thereby forestalling any imputation of their conduct and knowledge to the company.

2. That the defendant, Pasotex, did not transport any of such contraband oil in interstate commerce.

■■ The first point is deemed unsound. The gaugers were employed to gauge oil in lease tanks preliminary to running the oil from such tanks to the facilities of Pasotex, for the purpose of transportation by its pipe line. What they did in this instance included the performance of such duties, though in a wrongful and illicit manner, but that did not detract from the resulting fact that their services contributed to the business of the employer and enabled it to realize revenue on the transportation of the large quantity of oil in question. The test, in deciding whether the conduct and knowledge of these employees should be imputed to the employer, does not turn on action consistent with or contrary to company policy, but instead the touchstone is the function of the employee. What these employees actually did, so far as impact on company business goes, was true to their function of measuring oil to be received and then running that oil into the facilities of the employer. There is a multitude of authorities dealing with criminal prosecutions against corporations based on imputations of acts

and knowledge on the part of the company's employees, and the clear weight thereof is against this defendant's contention. New York Central & Hudson R. R. Co. v. United States, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613; United States v. A. & P. Trucking Co., 358 U.S. 121, 79 S.Ct. 203, 3 L.Ed.2d 165; United States v. Illinois Central R. R. Co., 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773; C. I. T. Corporation v. United States, 9 Cir., 150 F.2d 85; Continental Baking Co. v. United States, 6 Cir., 281 F.2d 137, 138; United States v. Armour & Co., 3 Cir., 168 F.2d 342; United States v. George F. Fish, Inc., 2 Cir., 154 F.2d 798; United States v. Van Riper, 3 Cir., 154 F.2d 492; Auerbach Shoe Co. v. Commissioner, 1 Cir., 216 F.2d 693; United States v. Empire Packing Co., 7 Cir., 174 F.2d 16; United States v. Milton Marks Co., 3 Cir., 240 F.2d 838; United States v. Kemmel, D.C., 160 F. Supp. 718; Old Monastery Co. v. United States, 4 Cir., 147 F.2d 905; Green, Moore & Co. v. United States, 5 Cir., 19 F.2d 130.

The defendant has cited for its viewpoint the case of Holland Furnace Co. v. United States, 6 Cir., 158 F.2d 2, and that decision is contradictory in some degree of other authorities, but the opinion of the Court seems to recognize that the "facts of the case" render it narrow as a precedent. In any event, unless that decision is limited, as indicated by the foregoing quoted language, it is out of step with many of the cases cited above.

■ The defendant's interstate commerce point is also deemed unsound. This question, as pointed out in various decisions of the Supreme Court, is to be dealt with in a quite practical way. The defendant's position seems rather unmindful of the distinct and significant pattern of corporate business reflected in this record. Pasotex is a member of a huge corporate complex, engaged in business as one of the major organizations in the oil and gas industry. It must be looked at in that light and not as though it were a separate segment, just a local bystander corporation. In fact it is a

vital link in the whole integrated business, and is a partaker in the fact that the far flung corporate aggregation already had an established course of business connection with the Kelly-Snyder Oil Field long before the indictment period in 1955–6. That organized course of business included the purchase of oil by Standard, the transportation of that oil by Pasotex to El Paso, where it went into Standard's refinery, and then the transportation of a large part of such products was resumed at El Paso by the Standard Products Pipe Line, another member in the corporate family, thence to the marketing area tributary to Alburquerque, New Mexico, and it seems that some of such products continued by pipe line to market in Arizona. The significant face of the picture is that under this settled and regular groove of business, the transportation performed by Pasotex carried oil already predestined, with business certainty, to a movement which would carry the products thereof to markets beyond the State of Texas, and that on a large scale. In other words, when Pasotex transported this contraband oil it was already certain from the outset that it, in the form of refined products, would go by interstate distribution to market. In a very practical sense Pasotex performed just one leg of an interstate movement and that as part of the corporate complex engaged in the whole movement.

■ The defendant cites the case of Arkadelphia Mill Co. v. St. Louis Southwestern R. Co., 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517. But the circumstances of that suit were wholly dissimilar from the scene in the present case. That suit, in the part of it pertinent here, involved simply one apparently isolated shipment of timber from the forest where it was cut out as rough lumber to a mill destination where it was made into hoops and staves, and the issue was over the application of an intrastate rate rather than an interstate rate. The Court in that case pointed out the fact that when the rough lumber was hauled from the forest to the mill it was then almost certain that the manufactured products in due course would be shipped to some point out of the state when sold and that, in the meantime, after the rough lumber was processed, the product items would be kiln dried and held for a time stacked in stock to wait until customers bought it, which course, on the average, took about five months before the goods would be ready to be sold and shipped out of the state for delivery, and the Court also explained that, at the time the rough lumber was shipped to the mill, no definite buyer was in mind and the final destination was unknown. Totally lacking was any large integrated business enterprise engaged in the sequence of working extensive timber lands, logging, and transporting to mill and manufacture of simple wood products, then finally taking same in interstate commerce to market. That is a clear cut and practical difference. There is no need to stop and speculate what the Supreme Court might have done in that case had it come before the Court, say, last year, because there are ample precedents closer to the present case sufficiently demonstrating that no novel doctrine would appear here in saying that the defendant Pasotex transported this contraband oil for one part of an interstate movement and that it is subject to the sanctions of the Connally Act. That Act was distinctly a remedial statute. It did not pronounce any transient policy, but has been maintained now for twenty-five years. There is no question that it has served as a potent buttress in support of the oil and gas conservation statutes, regulations and administration in Texas. If the position of the defendant is right, it should be so declared, but such event would go to show that after all it is easy enough to elude the reach of the Act. Of course, the main target of the Act is oil produced in violation of the allowable production fixed by the Railroad Commission, which naturally strikes a direct blow at the cause of conservation. Typically, it would seem that royalty and other rightful interest owners are the inevitable victims, since the guilty operator would hardly risk exposure by

sending statements and checks to said owners of the contraband oil, and their stake in the conservation program would be really defeated. Moreover, any later reparation could be too difficult. This point apparently is illustrated in this case by the testimony of the witness Caraway when his attention was directed to Government Exhibit 340, a letter he had written, and he was then asked whether he took any action to make production payments to the leases actually producing oil credited to other leases after he had determined there was such contraband production and he replied, "No sir, we did not know where the excess might have been coming from." (Tr. 128) Likewise, the purpose of the Act was defeated just as surely by the transportation to El Paso performed by Pasotex, as it would have been had the defendant also taken up again after the refinery stage and transported the products on to markets in New Mexico and Arizona.

The authorities which are relied on to support the views herein stated are, as follows: Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 505, 525–527, 31 S.Ct. 279, 55 L.Ed. 310; Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Eureka Pipe Line Co. v. Hallanan, 257 U.S. 265, 42 S.Ct. 101, 66 L.Ed. 227; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Carson Petroleum Co. v. Vial, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626.

The defendant Pasotex Pipe Line Company is convicted and fined $2,000 on each of Counts 1, 2, 3, 5, 6 and 7.

*Count 4*

■ The proof is too equivocal for conviction on above Count. The evidence, such as it is, tends more to the probability that the oil in question was used in acidiz-

ing work on some other wells than being the subject of interstate transportation. Government Exhibit C.

The defendant Pasotex Pipe Line Company is found not guilty on said count.

*Count 8.*

Here again the proof is too meager and uncertain to warrant a conviction. Apparently the key here is the entry showing no tenderable oil on hand June 1, 1956, as reflected in Government's Exhibit D. The exhibit is not right intelligible to the uninitiated. The entry of no tenderable oil on hand seemingly was a sequel to another entry which would have shown a minimum excess delivery of 86 barrels in May 1956, but it looks like the figure "86" was crossed out, and maybe if there was no excess oil run in May, then it should follow that there was some tenderable oil on hand the first of June. Anyway the evidence, including not only said Exhibit, but oral testimony on the matter, fails to disclose an understandable explanation. The defendant Pasotex Pipe Line Company is found not guilty on Count 8.

*Counts 9, 10, 11, 12, 13, 14 and 15*

■ The above Counts deal with charged conduct affecting the wells on the Mrs. Jesse Brown leases, operated by Standard, located in Segment 1 of the Sacroc Unit. The evidence makes reasonably clear a broad outline of illicit practices in the working of said leases during the period from November 1, 1955, to about June 1, 1956, and the picture is that said property was beset with condemned activities. The prominent individual participant was the defendant Purcell. There is the appearance of widespread license, but the proof falls short of pinning things down sufficiently from the standpoint of a criminal prosecution, except in the instance of Counts 11 and 12. There is ample evidence throughout the period, showing the perfunctory execution of Pasotex gauge tickets which would be signed by employees of Standard as witnesses without them having actually witnessed the gauger's measurement, and there is evidence of false gauge

tickets, which would misstate either the opening level or the closing level of the tank and certain equalizer pipe connections were habitually left open and could have been the means of oil running from a lease tank into the gathering line of Pasotex and, consequently, would never be credited to the producing well, and there is proof of instances when gaugers purposely ran more oil than was reflected in their gauge tickets, all of which fugitive practices might well have resulted in an unidentified but substantial production of oil over the allowable of one well or another and more certainly resulted in the production of oil that was not properly credited to the producing well. In respect to Counts 11 and 12, there is further and more specific evidence of several pipe line tickets issued and purporting to record oil run from the Brown leases and then afterwards voided. The explanation was not satisfactory, and any plausibility it might have had otherwise was rather impeached by the further proof that, during the time in question, the defendant Purcell, foreman gauger for Pasotex, was insistently talking to the gaugers about shortages which had accrued at Pasotex Station No. 1 and was telling them that measures must be taken to make up the shortage. Of course, if the pipe line tickets, which were voided, had recorded oil actually run from the Brown leases, and any such voided ticket was not replaced by a duplicate, that would provide a partial make-up on the shortage. The record indicates that the shortage or shortages, which plagued Purcell, resulted from false pipe line tickets being issued at Pasotex Station No. 2 for fictitious oil attributed to the depleted Thompson leases, and there is some proof along that line. The Standard pumper-gaugers became aware of the shortage difficulty at Station No. 1 and the exploits in that connection on the Brown leases were done with the knowledge, acquiescence and cooperation of said employees. It all stirs affirmative suspicion, but is not demonstrable enough to discharge the Government's burden of proof, except with respect to Counts 11 and 12. The defendants Pasotex and Standard are both convicted on Counts 11 and 12, and Pasotex, being the more culpable, is fined $2,000, and Standard, being less culpable, is fined $1,000 on each of said two Counts. The oil wrongfully taken from the Brown leases, not being oil charged against the allowable limit of the well or wells used, was contraband oil within the meaning of the Act, whether or not such output at the time lifted the current production over the allowable figure of the well. See Government Exhibit 215.

The said two defendants are each found not guilty on Counts 9, 10, 13, 14 and 15, respectively.

*Count 16*

The defendants Standard and Pasotex, respectively, did not make and keep proper pipe line tickets on the production from the Brown leases, in that the Standard pumper-gauger, by a general and well known practice, contrary to the regulations promulgated by the president, signed as witness on tank gauge records made by Pasotex gaugers, when in fact the Standard employees had not actually witnessed the gauge recorded by the Pasotex employee, and such neglect and omission was imputable to the employers, or, at least, was such a common thing that the employers must in all reason have known of such practice. Pipe line run tickets were falsified frequently. B. S. W. entries were usually "boilerhoused". Furthermore, oil was run from the Brown property during the time mentioned in above Count without Standard, as operator, or Pasotex, as pipe line carrier, making a proper record and credit thereof to the producing well and lease. The defense urged by Standard and Pasotex is that the said Count lacks the word "knowingly", but the nature of the charge necessarily implies that it was done knowingly, either by imputation or, at least, it would be reasonable to say that even those in the higher rank of these well organized and affiliated corporations, in the course of their proper and usual attention to mutual duties and supervisory responsibilities, must have known the

negative fact that neither company was keeping the required records. The question here is not pinpointed to some single and, perhaps, inadvertent or forgettable omission, but relates to a continuing course of business, day after day, involving hundreds and hundreds of failures to comply with the legal record keeping requirements.

The omission may rightly be treated as insignificant. Wheatley v. United States, 4 Cir., 159 F.2d 599; Griffith v. United States, 6 Cir., 230 F.2d 607.

The defendants Standard and Pasotex are both convicted and each is fined $2,000 on Count 16.

*Count 18*

■■ Undoubtedly there was a conspiracy of the kind described in above Count. The Government's brief in this connection recites misdeeds of certain employees, some working for Standard and some for Pasotex, either manifesting a definite violation of the Act, or else having a tendency towards such a violation, with the earmarks all together of a conspiracy. The Government counsel then state "It follows that their corporate employers also thus conspired." This seems to be a conclusion of law and is so crucial that it should have been fortified by whatever authorities may vindicate it as a correct proposition. Of course, it is familiar law that a substantive offense committed by a corporate employee in the scope of his employment will be imputed to the corporation, but it remains to be decided whether the fact that the corporate employee may have acted in concert with other individuals in the commission of the substantive offense will similarly by imputation implicate the corporation in the conspiracy. This may be a valid theory, but at least it is novel enough to have called for the citation of authorities. It seems to have been a step removed from the imputation of the substantive offense. The substantive offense is the thing that was done in the line of the employee's regular work and such a thing might have been done under circumstances quite apart from the presence of any conspiracy. The elements of a conspiracy include the requirement that the conspirator had knowledge of and directly consented to and joined in the plot. It may be that the assent of some agent in supervisory or executive authority would be necessary to commit a corporation to a conspiracy. Without any better lights the defendants Standard and Pasotex are found not guilty on Count 18. United States v. Howell, D.C., 56 F. 21; Nelson Radio & Supply Co., Inc. v. Motorola, Inc., 5 Cir., 200 F.2d 911; Pinkerton v. United States, 5 Cir., 145 F.2d 252; Jones v. United States, 10 Cir., 251 F.2d 288.

*Other Defendants*

The defendants Leslie P. Morgan and R. P. Ware each plead guilty on Counts 2, 6 and 7, and as to them the remaining counts were dismissed, and the imposition of sentence deferred to a later date.

The defendant J. P. Purcell entered a plea of not guilty on each Count against him and was tried along with the corporate defendants Standard and Pasotex. The determination by the Court in respect to the defendant Purcell will be announced later, in open court, probably at the same time the defendants Morgan and Ware come up for sentence.

The defendant Palmer G. Powell remains to be tried.

The United States District Attorney is directed to draw a judgment in conformity with the findings herein against the defendants Standard and Pasotex, sending a copy to each of respective counsel for defendants, and submit same to the Court with reasonable promptness.